[Crim. No. 1027.   Fourth Dist.   June 27, 1955.]

THE PEOPLE, Respondent, v. MARTIN LUTHER HUFF, Appellant.

Buttermore & Lightner and Wesley B. Buttermore, Jr., for Appellant.

Edmund G. Brown, Attorney General, Clarence A. Linn, Chief Assistant Attorney General, and Victor Griffith, Deputy Attorney General, for Respondent.

BARNARD, P. J.—The defendant was charged with issuing a check without sufficient funds in violation of section 476a of the Penal Code, and in a second count with conspiracy to commit that crime in violation of sections 182 and 476a of that code. He was also charged with a prior conviction, which he admitted. A jury found him guilty on both counts of the information, and judgment was pronounced imposing a prison term. He has appealed from that judgment.

On March 20, 1954, the appellant presented a check to an employee of a department store in Pacific Beach, who refused to cash it. The check was for $120, signed by one James Hall and payable to the appellant. Hall and Huff then went to a paint store where Hall bought paint amounting to about $10. The proprietor refused to accept the $120 check but cashed another $30 check, which was written by Hall. Hall and Huff then went to a dress shop where they were shown some dresses by a Mrs. Brody. They selected a dress, priced at $24.95, and tendered the $120 check saying that Huff worked for Hall and this was his pay for the week. When Mrs. Brody refused to accept the check they left.

Hall and Huff then went across the street to a bar, and secured a blank check from the bartender. In the presence of Huff, Hall wrote a check for $75 payable to Martin Luther Huff and signed "Mrs. James Hall." Huff then went back to the dress shop and purchased the dress for $24.95, giving Mrs. Brody the $75 check and receiving the change. Huff endorsed the check Martin L. Huff. While Huff was in the dress shop Hall kept walking to the entrance of the bar and looking across the street to the dress shop. When Huff returned they left the dress and paint in the bar, and went away together. The dress was later returned to Mrs. Brody. It was stipulated that there was no account in the bank on which the two checks were drawn, either in the name of Mr. Hall or Mrs. Hall. Mrs. Hall testified that she did not sign the $75 check, and that she had reimbursed the dress shop and the paint store for their loss on these checks. Mr. Hall was in jail in Oregon at the time of the trial.

The appellant testified that he had worked for Hall selling fruit for two weeks in March, 1953; that he had recently returned from an ocean fishing trip and was not in need of money; that Hall was trying to buy a truck so he told Hall he would wait for his pay; that he went to see Hall on March 20, 1954, about collecting $92 which Hall owed him for his labor; that Hall asked him to buy a dress for Hall's

wife and gave him a check for $120, telling him not to pay over $30 for the dress; that when the dress shop refused to accept the check Hall wrote another check for $75 payable to him, which he used to purchase the dress from Mrs. Brody; that he asked Hall about the check being signed "Mrs. James Hall"; that Hall said the money was in her account but he, Hall, had authority to sign her name; that Hall told him to tell Mrs. Brody that he had gotten the check from Mrs. Hall, which he did; and that he was ignorant of the fact that the $75 check was not good. Mrs. Hall testified that Huff worked for her husband for only three days; that Hall did not owe money to Huff; that she kept the books and paid Huff at the end of each day; and that she wore a size 9 dress, which was five sizes smaller than the one purchased by Huff.

It is not contended that the evidence is not sufficient to support the verdict. It is contended, however, that the appellant was deprived of due process of law because the court's cross-examination of the appellant, his interruption of defense counsel's argument to the jury, and his comments to the jury on the evidence amounted to advocacy for the prosecution.

After the appellant testified as above stated, the district attorney cross-examined him at length. Early in that cross-examination the appellant stated that he returned from a fishing trip on a certain day, and that he worked for Hall the last part of March or the first part of April. The court then interrupted and asked questions taking up three pages of the transcript. These questions related largely to why he could not remember the exact dates when he worked for Mr. Hall. Among other things, the court asked, "How do you remember this getting off the fishing boat so accurately and you can't tell how late you worked for Mr. Hall?"

At the conclusion of the district attorney's cross-examination the court questioned the appellant, as disclosed by six pages of the transcript. These questions related largely to the $75 check. Among other things, he asked the following questions:

"This $75 check is the second check you had gotten from Hall isn't it?

"You were sitting at the bar there when this check was written. Did you inquire of him why he didn't sign it 'Mrs. James Hall by James Hall'?

"You saw your name on the front 'Martin Luther Huff.' Why did you sign it Martin L. Huff on the back?

"Why didn't you tell him to make it Martin Luther Huff on the front?

"Were you sort of nervous when you went over and cashed this check?

"Well, you had been turned down with one check before with that same story, hadn't you?

"Hall told you to tell them that she signed the check. Did that make you suspicious as to whether or not he had the right to sign her name?

"Why would he tell you that?

"Why didn't you have him give you a check for $120 and then leave?

"Well, that wasn't any concern of yours, was it? (referring to the statement that Hall wanted him to get a dress for Hall's wife)

"You went through all three of these check episodes to get part of your money?"

While appellant's counsel was arguing to the jury, and while he was arguing that the appellant, not being a lawyer, would not know that the check must be signed in a certain way; and that there might have been some agreement with the bank or a power of attorney on file authorizing Hall to sign for his wife, the court interrupted to say, "If you had a power of attorney, Mr. Buttermore, you would still have to sign it 'so and so by so and so.' "

After the conclusion of the arguments and immediately prior to giving his regular instructions, the court made some general remarks which take up five and one-half pages of the transcript. So far as material here, these remarks are as follows:

"This is the time for me to give you the instructions on the law applicable to this case. I have nothing to do with determining the facts in this case. It's entirely up to you. After listening to the testimony in this case for the last day, it must be apparent to you at this time that somebody in this case isn't telling the truth. Now, *its* up to you to determine who is telling the truth in this case. The only actual victim in the case, of course, is Mrs. Hall. She has testified that she made these checks good. . . . I will instruct you in this case to try only one person. The only person you are supposed to try in a criminal case is the defendant. Determine whether or not he is guilty or whether he is innocent, but don't try other people.

"Now, these intended victims, . . . have been reimbursed.

. . . what reason would they have to come in here at this time and under oath to tell you a falsehood? Those people having been the original victims, . . . would immediately reconstruct what happened and think back how the thing happened and they would bear that in mind. . . . I venture to say that if you had ever taken the check for $75 or $100 and being victimized, I think the minute you found out from the bank that the check wasn't any good, I think you would immediately be raking your mind to remember everything that happened and why you were taken in, and I don't think you would forget that very soon. . . .

"Mrs. Hall testified that she and her husband never had a bank account. . . . Personally, I think that Mrs. Hall lived out there in the community . . ., and I think that is probably why she made the checks good. One of the checks did have her name on it and . . . to prevent people from pointing the finger at her, why she paid off these checks, and I think it was a noble thing to do. I think *its* more than most women would have done if their husband had got in trouble and left town.

"This blue check that we have in evidence, . . . I want you to look at that carefully when you go out, as to how *its* endorsed and to whom *its* made payable to and the figures on it and the signature, 'Mrs. James Hall.' Now, I asked Mr. Huff when he was on the stand whether it didn't seem peculiar to him that if Mr. Hall had a right to sign his wife's signature to the check, whether it shouldn't have been signed Mrs. James Hall by James Hall in order to clear the bank. That is the way a check is signed. If I have an account and I give somebody power of attorney to sign on that account, they have signed my name by so and so. Of course, what happens, anybody passes one of those checks, so and so by so and so, it always raises in the mind of the person that is about to accept the check, 'Well, does this man have authority to sign that name?' . . . Mr. Huff did say that he went in and he told the people that Mrs. Hall had signed this check. He was right there when the check was made out, and I don't think that I would have done that. Does it seem reasonable to you—and this is for you to determine if a relationship existed between Mr. Hall and Mr. Huff as he said it did a year before and he had ninety some dollars coming—would he wait one whole year, or eleven months, whatever it was, in order to collect that money? Would he wait until a Saturday afternoon when all the banks are closed, to collect that money?

Would he, in order to get that money, or only a part of it, go to a store and buy a dress, as he says, for the other man's wife? If somebody owed me money and he had owed it to me for a year, I certainly wouldn't run from place to place and tell people that I was buying a dress for somebody else in order to get them to cash a check. . . .

". . . you are not to throw away the good sense that you came into the courtroom with, just because you go out to the jury room to deliberate. Please take that good common sense along with you . . . just put yourself in the place of (the victims and the defendant). . . . What would you have done? And, just be reasonable. That's all we ask you to do, and, determine the true facts in this case, and if you arrive at the true facts, why, you will have no regrets when you leave the jury room."

While the questions asked by the court were not objected to, and the court told the jury that it was not to assume from his questions that he held any opinion as to the matters to which the questions related, and repeatedly told the jurors that they were the exclusive judges of all questions of fact, the questions thus asked may well have had a deciding weight against the defendant. (*People* v. *Byrd,* 88 Cal.App.2d 188 [198 P.2d 561].) Moreover, the effect of these questions would naturally be increased by the comments made immediately preceding the giving of the instructions on the law.

While a judge may comment on the evidence, including the credibility of witnesses (Const., art. VI, § 19; Pen. Code, § 1127), this privilege has its inherent limitations and must not be of a nature which would invade the province of the jury. (*People* v. *Ottey,* 5 Cal.2d 714 [56 P.2d 193].) Even an expression of opinion concerning the guilt or innocence of a defendant may not be fatal provided the province of the jury is not invaded. (*People* v. *Eudy,* 12 Cal.2d 41 [82 P.2d 359].) However, such comments should be temperately and fairly made and trial courts should be cautious in exercising this power of comment with a view to protecting the rights of the defendant. (*People* v. *Dail,* 22 Cal.2d 642 [140 P.2d 828]; *People* v. *DeMoss,* 4 Cal.2d 469 [50 P.2d 1031].) It has been held that it is improper to commend a witness in the presence of the jury because of the undue weight which would thus be given to the testimony of this witness. (*People* v. *Frank,* 71 Cal.App. 575 [236 P. 189].) A judge should be careful not to throw the weight of his judicial position in a case, either for or against

the defendant. (*People* v. *Mahoney*, 201 Cal. 618 [258 P. 607].) ■ The rule is well established that such comments on the evidence "must be fair, temperate, judicial, dispassionate, and free from apparent contentiousness, partisanship or advocacy." (*People* v. *Hooper*, 92 Cal.App.2d 524 [207 P.2d 117].) Such comment must be fair and temperate and not argumentative to a degree that makes it characteristically an act of advocacy. (*People* v. *Robinson*, 73 Cal.App.2d 233 [166 P.2d 17]; *People* v. *DeMoss*, 4 Cal.2d 469 [50 P.2d 1031].) In *People* v. *Byrd*, 88 Cal.App.2d 188 [198 P.2d 561], it was held prejudicial to ask a question where, from the form of the question, a jury would necessarily infer that the judge was not only questioning the truth of the defendant's general testimony, but also the truth of his denial of the commission of the crime for which he was on trial as well.

■ In our opinion, the questioning and comments here exceeded permissible limits, and were such as to deprive the appellant of the fair trial to which he was entitled. They were argumentative to an unusual degree and, in effect, were strong arguments for a conviction. They bore directly upon appellant's sole defense, and amounted to the advocacy which is not permitted.

The judgment is reversed, and the cause remanded for a new trial.

Griffin, J., and Mussell, J., concurred.

A petition for a rehearing was denied July 7, 1955, and respondent's petition for a hearing by the Supreme Court was denied July 27, 1955.