[Crim. No. 1042. Fourth Dist. Jan. 6, 1956.]

THE PEOPLE, Respondent, v. G. DELBERT MORRIS, Appellant.

Myron Kaminar for Appellant.

Edmund G. Brown, Attorney General, William E. James, Deputy Attorney General, James Don Keller, District Attorney (San Diego), and Jack R. Levitt, Deputy District Attorney, for Respondent.

BARNARD, P. J.—The defendant was indicted by the San Diego County grand jury on two counts of perjury. The first count charged him with swearing falsely before the grand

jury on July 7, 1954, and a second count with swearing falsely before the same body on November 24, 1954. A jury found him guilty on both counts, and he has appealed from the judgment.

The defendant was an assemblyman from Los Angeles County and these charges grew out of an investigation into his activities in connection with the issuance of a liquor license to one Felix Woempner, who lived in San Diego County. The surrounding facts may be briefly stated as follows:

About December 1, 1953, Woempner had tried, without success, to obtain a liquor license at the San Diego office of the Board of Equalization, hereafter referred to as the board. Woempner then asked the defendant to help him secure such a license. The defendant returned to Los Angeles and talked to one Kahl, who referred him to Leonard Wilson, an attorney. The defendant contacted Wilson, who asked for a fee of $150 for going to San Diego to discuss the matter with Woempner. The defendant advised Woempner to send Wilson a check for $150 and to mark it "legal fees and expenses." This was done and Wilson went to San Diego. Wilson then told the defendant that he had seen Charles Berry, who was in charge of the San Diego office of the board, and had arranged with him that Woempner should refile his application and that "everything would be set." At the same time, Wilson told the defendant that Woempner would have to pay $2,600. The defendant called Woempner on the telephone and told him that such a payment was required and Woempner agreed to make the payment, provided it was not to be made until such time as the license was actually granted or assured. Wilson agreed to this, and Woempner reapplied for the license. His application was approved at the February meeting of the board, and he received his license. In the meantime Wilson attended the January and February meetings of the board. On each occasion he contacted the defendant and asked for $150. The defendant relayed this information to Woempner, who sent checks for this amount to Wilson marked "For legal fees and expenses." After his first trip to San Diego, Wilson did not contact Woempner personally, and thereafter all such contacts were made through the defendant. On February 18, 1954, Wilson called the defendant and asked him to call Woempner with respect to the payment of the $2,600 and to tell Woempner that this payment "has to be made in cash." The defendant then went to San Diego and picked up the $2,600 from Woempner. He returned to Los Angeles and

gave the money to Wilson. He asked for a receipt but did not receive one.

At the first hearing before the grand jury on July 7, 1954, the defendant testified very strongly to the effect that this $2,600 payment was stated to be, and was made as, a campaign contribution and that nothing was said about its being made as an attorney's fee. He then stated that when the $2,600 was first mentioned, Wilson suggested that he call Woempner and tell him that "the boss" was running for reelection and they were building up a campaign fund and "if Mr. Woempner wants his license it will be necessary for him to make a contribution in the amount of $2,600 to this campaign fund"; that he called Woempner and explained the situation to him; that Woempner said there was nothing he could do except to agree to make the contribution, but asked to have it deferred until notified that the license would be issued; that Wilson agreed to this; that "at no time did he refer to this $2,600 as his legal fee"; that after the license was approved by the board Wilson said "This campaign contribution has to be made in cash," and asked him to go down to San Diego, get the money from Woempner, and bring it back to him; that he went to San Diego and told Woempner. "If you have Mr. Wilson's campaign contribution ready I will take it back to Mr. Wilson"; that Woempner gave him the money; that the next day he gave it to Wilson saying "This is Mr. Woempner's campaign contribution"; that he asked for a receipt; and that Wilson said that this was a campaign contribution and he did not feel that it was necessary to give a receipt for it.

At the second hearing before the grand jury, on the morning of November 24, 1954, the defendant told the same story as to his activities in connection with the obtaining of this license, but testified very strongly that this payment of $2,600 was stated and understood to be a payment of attorney's fees to Wilson. He then stated that when the $2,600 was first mentioned Wilson said that there would be quite a bit of work in connection with obtaining the license and that he would have to appear before the board; that "That's my fee for obtaining the license for Mr. Woempner"; that if Woempner "doesn't feel that he wants to pay that fee then we will have to call the transaction off"; that Wilson asked him to call Woempner and find out if "he would be willing to pay the $2,600 fee"; that he called Woempner and told him that this $2,600 was the fee set by Wilson, and that if he did not feel that the fee was warranted he should call the transaction off; that Woempner told him that he would pay the fees required by Wilson, but asked

---

to have the payment deferred until a license was assured, to which Wilson agreed; that after the license was approved by the board Wilson asked for the payment of "his legal fee" and asked him to take the matter up with Woempner; that he asked Wilson to call Woempner personally because "he is your client and its your fees"; that Wilson insisted that he go to San Diego and see Woempner; that he called Woempner and told him that Wilson wanted his fee paid in cash; that he went to San Diego and told Woempner "the only thing then left for me is to pick up Mr. Wilson's legal fee and take it to him"; that Woempner gave him the money and he took it to Wilson; and that Wilson told him his fee would be $2,600 and he told this to Woempner. During the remainder of that session before the grand jury on the morning of November 24, the defendant testified many times that the payment of this $2,600 was discussed on a number of occasions, that it was spoken of as Wilson's legal fee, and that there had "never been any talk of anything except that it was a fee for the Judge (Wilson, a former judge) and that he said he wanted it in cash."

The session before the grand jury on November 24, 1954, was continued on the afternoon of that day. The defendant then stated that when Wilson talked to him "about this $2,600 legal fee" he passed that information on to Woempner; that when he turned the $2,600 over to Wilson nothing was said about this money being treated as a campaign contribution; that when the money was turned over to him by Woempner there was nothing said by either of them that it had anything to do with a campaign contribution; that when the $2,600 was first mentioned to him by Wilson he indicated that this would take care of all of his expenses and of all of his legal fees, and that part of it would go as a campaign contribution to "the boss"; that he had then told Woempner that "This was a campaign contribution"; and that his testimony on that day was "substantially" the same as his testimony before the grand jury on July 7. When asked whether he knew that it was illegal for a person having a licensing authority to solicit campaign funds for a license, he replied: "I didn't take a campaign contribution for Mr. Bonelli." He further stated that when he took the $2,600 to Wilson for Woempner he had no way of knowing what it was to be used for, that he understood a part of it was to be used for a campaign contribution but did not know if it was actually so used; that this money was paid to Wilson as a fee; and that Wilson never discussed

its being used for any other purpose "outside of the one reference that he made to the fact that part of it would be a campaign contribution to 'the boss.' "

■ The appellant first contends that the evidence was insufficient, as a matter of law, to sustain his conviction as to either count. It is argued that there was no evidence to show the falsity of any of his statements relating to his conversations with Wilson, who was dead and could not testify; that the contradictory statements appellant made under oath are not sufficient to sustain the charges since, under the authorities, it must be shown which of the two statements is false, by evidence other than the contradictory statements themselves; and that the falsity of appellant's statements regarding what he told Woempner was not shown because of Woempner's qualified answers to the questions asked of him while on the stand.

Wilson had committed suicide before the trial and his evidence was not available. However, there was other evidence sufficient to sustain the charges contained in these counts. The evidence was sufficient to support a finding that neither of the statements made to the grand jury by the appellant on July 7 and the morning of November 24 was true. It was well known, and never disputed, that the appellant had obtained this money for Wilson and that it had some connection with the issuance of a liquor license. The purpose of the grand jury investigation was to ascertain the reason why that money was thus paid and what it was to be used for. The two stories told by the appellant to the grand jury were clearly contradictory and while that testimony, which was read to the jury, was not sufficient in itself to sustain a conviction, on technical grounds, it could be considered in connection with the other evidence and when so considered it discloses a willful intent to commit perjury.

Woempner testified at the trial with respect to the general circumstances. He further testified that the appellant told him that Wilson "would want about $2,600 for the permit"; that the appellant did not tell him that Wilson wanted the money for any particular purpose, but that "he just said that would be the price of the permit"; that the words "attorneys fees" or "campaign contribution" were not mentioned to him by the appellant; that when the appellant came down and picked up the money he did not refer to it as anything other than the money Mr. Wilson wanted; that the appellant at no time prior to the indictment ever re-

ferred to the $2,600, in whole or in part, as a campaign contribution or as an attorney's fee; and that no one prior to January 26, 1955, ever referred to the $2,600, or any part of it, as a campaign contribution or as attorney's fees. He was asked questions along this line many times and to some of them gave such answers as "I don't believe so," "I don't think so," and "I don't remember." However, his testimony as a whole was such that the jury could accept it as flatly denying that the appellant had, at any time, made the statements to him which the appellant told the grand jury he had made.

A special agent for the Department of Justice testified that he talked to the appellant on July 2, 1954; that the appellant told him that Wilson had told him that it would cost Woempner $2,600 for the license, and that the words "political contribution" were never mentioned; that he had a second conversation with the appellant on July 22, at which time the appellant told him that Wilson had not told him that the money was for a political contribution, and that he had never discussed the matter of political contributions with Woempner.

A letter written by the appellant to his friend Richins, dated December 14, 1954, was introduced in evidence. Insofar as material here, it stated:

"When you see F.W. be sure and tell him how much I appreciate the story he gave to the press which, of course, substantiates the testimony I gave to the Grand Jury.

"When you talk with him see if you can verify the exact date you and I went to S.D. on the train. . . .

"Also be sure to remind Felix that I have never ever discussed with him what L.W. was going to do with that money. All I told Felix was that it was L.W.'s fee for getting him the license. If he and L.W. discussed some of it going for campaign contributions I never knew anything about that. . . .

"Please tear this up after you have read it."

The defendant testified at the trial that his statement before the grand jury on July 7, to the effect that he had contacted Woempner when Wilson first mentioned the $2,600 and that Woempner told him he would like to wait until the license was issued before he made the $2,600 campaign contribution, was correct; that his statement in the letter above quoted, to the effect that all he had told Woempner was that the $2,600 was Wilson's fee for getting him the license,

was correct; that his statement to the grand jury on July 7, that "At no time did he refer to his $2,600 as his legal fee, was correct; that his statement to the grand jury on November 24, to the effect that he had told Woempner at that time that the $2,600 was for a legal fee and expenses to Wilson, was correct; that he had told Woempner it was a legal fee the first time the $2,600 was mentioned; that both statements, that the first time he knew about the $2,600 he had told Woempner that it was to be a campaign contribution, and that he had told Woempner that it was to be Wilson's legal fees, were "both correct"; that when he made these statements he was speaking from memory some months after the incident occurred; that "To me it was not a transaction that was of any particular importance"; and that "All I knew was that Woempner was required to pay $2,600 to obtain his license and that is what I told the Grand Jury."

The appellant not only told two elaborate and inconsistent stories to the grand jury on different occasions, with respect to what Wilson had said this money was to be used for, but as to each story he stated that he had told the same thing to Woempner. Woempner denied that these things were told to him by the appellant. The appellant, on the stand, testified that each of the two inconsistent statements was true and gave an explanation which was obviously unsatisfactory and which the jury was entitled to disbelieve. He had told one witness, a few days before July 7, that a campaign contribution had not been mentioned, and his detailed statements to the grand jury on that date could not reasonably be explained on the ground of a poor memory or a failure to realize their importance. The evidence as a whole discloses ample reason for refusing to accept such an explanation for his contrary statements to the grand jury on November 24. In view of the inconsistent statements made by the appellant, his declarations and admissions, the evidence as a whole, and the inferences reasonably to be drawn therefrom, it cannot be held that there was not sufficient corroboration for Woempner's testimony, or that the evidence was insufficient to support the finding of guilt as to both counts.

It is next contended that the appellant was deprived of a fair trial by certain questions asked and comments made by the trial judge. It is argued that these constituted argumentative advocacy in favor of the prosecution, and practically took away from the jury the important question as to whether or not the appellant intended to wilfully mislead and deceive the grand jury when he testified before it.

While being cross-examined by the district attorney the appellant had stated that each of the two inconsistent stories he had told to the grand jury "was correct." When asked which of the two stories was "accurate" he replied that both were accurate and asked permission to explain, which was given. He then made a long explanation, in the course of which he stated that the transaction had occurred about six months before he appeared before the grand jury; that "to me it was not a transaction that was of any particular importance"; that he had made no notes on it; and that "All I knew was that Mr. Woempner was required to pay $2,600 to obtain his license and that is what I told the grand jury." The court then asked the appellant whether it was not unusual for him to go to somebody and pick up $2,600 in cash and deliver it to somebody else. The appellant replied: "Very unusual." After some comment between court and counsel the court asked "Wasn't that an unusual situation" and the appellant replied, "It was the only time it ever happened." The court then asked whether that made an impression on the appellant and whether it would not "make an impression as to why you picked it up, and the circumstances surrounding it," to which the appellant replied, "That that was the money that he wanted for getting the license for Mr. Woempner. Certainly it impresses me." The judge then asked several questions as to how he brought Woempner into contact with Wilson, as to why he did not let them handle their own transaction after they became attorney and client, and why he interceded on this $2,600, in answer to which the appellant stated that he arranged for Wilson to go to San Diego and contact Woempner, that thereafter Wilson insisted that he call up Woempner every time it was necessary, and that he then made all contacts between Woempner and Wilson at Wilson's insistence.

It is further argued in this connection that the court's comments to the jury were unfair and calculated to impress the jury with the apparent belief that the judge thought the appellant guilty of perjury. Immediately prior to giving his instructions the judge made "some preliminary comments" at great length. While these remarks should not have been made, most of them were more or less immaterial. The appellant complains of the judge's lengthy explanation as to why a transcript of appellant's testimony before the grand jury on July 7 was not furnished him before his second appearance before the grand jury. The appellant

had stated that he had had no such transcript and the judge explained that such transcripts were not furnished until and unless an indictment was brought. Complaint is made that the judge, after telling the jury that the defendant's statement on the stand that he had no intention to give false testimony was evidence to be considered by the jury, went on to say "Now, of course, you will have to evaluate the testimony here on the other side to determine whether or not there was intent." Complaint is also made of the judge's reference to the Weinberger Committee and the matter of campaign contributions, on the ground that this was outside the evidence since there was no evidence that Woempner was a licensee of the board in December, 1953, and January, 1954, at which time the appellant was having the conversations with Wilson about which he testified before the grand jury. Woempner was a licensee when the $2,600 was paid and the preceding conversations were a material part of the transaction.

A trial judge may ask questions of a defendant merely for the purpose of eliciting the truth, providing his constitutional rights are not infringed. (*People* v. *Ottey,* 5 Cal.2d 714 [56 P.2d 193].) Questions may be asked for the purpose of giving a defendant an opportunity to explain his reasons for having made certain statements or giving him an opportunity to reconcile, if possible, apparently conflicting statements which he has made. (*People* v. *Buratti,* 96 Cal.App.2d 417 [215 P.2d 500]; *People* v. *Butterfield,* 40 Cal.App.2d 725 [105 P.2d 628].) Under the constitutional amendment art. VI, § 19), a judge may make some comment on the evidence and the testimony and credibility of a witness. (*People* v. *Rupp,* 41 Cal.2d 371 [260 P.2d 1].) The explanation of the inconsistent statements here given by this appellant naturally called for some clarification, and some of the questions asked and comments made by the trial judge could properly have been asked and made. The court here fully instructed the jury that in asking questions of certain witnesses during the course of the trial his object was to bring out in greater detail facts not then fully covered in the testimony; that the jury was not to assume, because of such questions, that he held any opinion as to such matters; that if during the trial he had said or done anything which may have suggested to the jury that he was inclined to favor the claims of either party, the jury was not to be influenced thereby; that he had not intended to express or intimate any opinion as

to which witnesses were worthy of belief or what inferences
should be drawn from the evidence; and that if any expres-
sion of his had seemed to indicate an opinion on any such
matter the jury was to wholly disregard it. While the
extent of the inquiry and comment indulged in by the court
is not to be commended, it cannot be held sufficiently preju-
dicial to require a reversal in view of the entire record. The
factual situation here differs materially from that found in
*People* v. *Huff*, 134 Cal.App.2d 182 [285 P.2d 17], relied on
by the appellant.

It is next contended that the court erred in three rulings on
the admission of evidence. It is first argued that the
court improperly restricted appellant's explanation of his let-
ter to Richins dated December 14, 1954, and above quoted.
While giving his explanation of what he meant by the letter
the appellant was asked by his counsel as to what had been said
in a previous conversation between the appellant, Richins and
Woempner. An objection was sustained, and the appellant
was asked to explain what he meant by the letter. He ex-
plained that by the first part of the letter he wanted Richins to
get the information referred to because he felt that this would
help prove that Wilson knew about the $2,600, and that he
asked Richins to tear the letter up because he did not want
him to get involved in this situation. There is nothing in the
record to indicate that the previous conversation asked for
would be material, that it would have added anything to the
explanation made, or that its exclusion had any prejudicial
effect. It is next argued that the court erred in keeping from
the jury a portion of the testimony given by the appellant
before the grand jury, and that the deleted portion pertained
to his state of mind at the time of the Woempner transaction.
The portion deleted was where the appellant stated to the
grand jury that he first talked with Richins about October 15,
1953, when Richins said that Woempner wanted the appellant
to help him get a license; and that he then told Richins that
his wife had passed away on October 3 and his two-months-old
daughter had just got out of the hospital, that he was not then
in a position to go anywhere, and that he would go with Rich-
ins to see Woempner after the first of December. No error or
prejudice appears in this connection. Finally, it is argued
that the court erred in limiting appellant's cross-examination
of one witness. This witness had used no notes during his
testimony, but had stated that he had made notes at the time of
the conversation about which he testified. Counsel for appel-
lant attempted to cross-examine the witness as to "how exten-

sive were the notes you took,'' and an objection was sustained No possible prejudice appears.

Two complaints are raised with respect to the instructions. It is first argued that the court instructed the jury that the accused could be found guilty upon either, or both, direct and circumstantial evidence; that a conviction of perjury could not be based upon evidence that is wholly circumstantial; and that although the court later gave a correct instruction on this matter the two instructions were inconsistent. ■ In the first of these instructions the court gave the general rules with respect to circumstantial evidence, but made no reference to the matter of perjury. Later, the court gave full instructions as to the essential elements of the crime of perjury and as to what must be proved in such a case and how it must be proved, including the statement that ''A conviction of perjury may not be based upon the uncorroborated testimony of a single witness or upon evidence which is wholly circumstantial.'' Neither error nor prejudice appears in this connection.

■ It is further argued that the court erred in instructing the jury as to the provisions of section 5002.5 of the Elections Code and with respect to principals; that the appellant was not charged with a violation of this code section; that there was no evidence that he had solicited a contribution from a licensee of the board; and that, at the time of the conversations between the appellant, Wilson and Woempner, Woempner was not a licensee of the board. Outside of the presence of the jury the district attorney told the court that section 5002.5 of the Elections Code was not applicable in this case except as it might show a motive on the part of the appellant, and appellant's counsel stated that he would not object if an instruction was given in connection with the matter of motive. The court twice told the jury that the appellant was not charged with a violation of that section, and that the substance of the section was given to the jury ''for the purpose of showing motive, if any '' No prejudice appears.

In view of the record as a whole it cannot be said that any errors which appear could reasonably be expected to have affected the result, or were sufficiently prejudicial to require or to justify a reversal.

The judgment is affirmed.

Griffin, J., and Mussell, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied February 1, 1956.