[Crim. No. 24776. Second Dist., Div. Five. June 25, 1974.]

THE PEOPLE, Plaintiff and Respondent, v.
COTTRELL JOHN HENRY MOORE, JR., Defendant and Appellant.

## COUNSEL

Richard H. Levin, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, James H. Kline and Carol Wendelin Pollack, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**LORING, J.**[*] — Defendant Cottrell John Henry Moore (Moore) was charged in count I with the crime of grand theft in violation of Penal Code section 487, subdivision 1 on November 13, 1972, in that he feloniously took property of a value in excess of $200 from Rita M. Zimmer. Count II charged the identical offense on the same date the victim being De Loss Delbert Eaton. He was also charged with a prior[1] felony in Allegheny County, Pennsylvania—the crime of attempted larceny. After a plea of not guilty to the two counts and the prior and a jury trial, a verdict of guilty on each count and the prior was returned. Moore's motions to set aside the jury verdict, for mistrial and for new trial were denied. A diagnostic study was ordered under Penal Code section 1203.03 after which Moore's application for probation was denied and he was sentenced to state prison for the term prescribed by law under the provisions of Penal Code section 1168 and given credit for 180 days in custody. Moore appeals from the judgment and order denying his motions to set aside the verdict, declare a mistrial and for a new trial. The appeal from the order being nonappealable will be dismissed.

### CONTENTIONS

Appellant's contentions may be summarized as follows:

1. He should not have been tried on two counts since at most he could only have committed one offense.

2. The trial court committed error in permitting the charge of the prior

---

[*]Assigned by the Chairman of the Judicial Council.

[1]He was actually charged with two priors but one was stricken.

(attempted larceny in Allegheny County, Pennsylvania) and allowing evidence of a prior to go to the jury because:

(a) It was an abuse of discretion since it was 11 years old and had no probative value.

(b) The alleged offense was a misdemeanor and not a felony.

(c) It should not be used to augment the punishment.

3. The judge coerced the verdict.

4. The judge erroneously refused to hear evidence on a challenge to the jury panel.

5. The cumulative effect of all of the error resulted in a miscarriage of justice.

## FACTS

Sometime commencing in August 1972, Moore was employed by an organization named Vinson, Inc., at least partially owned and at least partially operated by Abraham Vinson, which business was engaged in the "personal service" business. The personal service consisted of arranging to put up collateral (for a fee) for persons in need of bail who could not obtain bail in the ordinary course because they were unable to put up the collateral required by bail bond agencies. A critical fact issue in the case was whether or not Moore was so employed on November 13, 1972. The People claimed that Moore's employment terminated the latter part of October 1972 when the business was closed down and ceased to function because Vinson had been committed to Chino after conviction on a felony burglary charge. Vinson testified that during the period of his commitment at Chino for 90 days observation commencing October 30, 1972, until his release on January 15, 1973, the personal service business did not function except to answer telephone calls and to take care of problems which arose in connection with bonds which had already been written— that the place was physically "padlocked." Vinson testified Moore was terminated October 25, 1972. Moore on the other hand denied that he had been terminated on October 25, 1972, and testified that he continued to write business as usual; that he was first employed August 14, 1972, and continued to work until the latter part of November or the first of December 1972; that during the time Vinson was at Chino "Bert" (later identified as Bert Warren) and Norma Rottadorf, Vinson's secretary and fiance, continued to run the business as they always had.

The People and Moore are in substantial agreement regarding what

happened on November 13, 1972. On that date (pursuant to prior telephonic arrangements) Moore went to the residence of De Loss Eaton in Whittier, California, at which time and place Lois Eaton (wife of De Loss), Linda Oliger (daughter of De Loss) and Rita Zimmer (mother of Steven Gregory Zimmer) were also present. The purpose of the meeting was to arrange for $10,000 bail for Steven Zimmer, who was then in jail and unable to post the required collateral. The Eaton family participated in the arrangement because Steven Zimmer was the fiance of Linda Oliger. The arrangements finally worked out required $1,000 premium for a $10,000 bond and $400 fee for putting up the collateral. In addition, during the course of the conference, it was discovered that an additional $318 was required for traffic tickets in Orange County. Of the total sum of $1,718 De Loss Eaton delivered to Moore $500 cash, and received a receipt and Mrs. Zimmer delivered to Moore a cashiers check for $900 and a personal check for $318. She was given receipts for both and the checks were made payable to Moore and bore his endorsement on the reverse side.

Steven Zimmer was never released from jail on bail because the bail bond was never put up. Up to this point the People and Moore are in agreement on the facts. The disagreement between the People and Moore was over what happened to the money. Moore claimed he turned it in at the Vinson office the following morning as he always did in the normal course of business and admits that he did not request and was not given a receipt. This was his usual practice. He had nothing to do in the normal course of events with procuring and depositing the actual bail bond. He denied using any part of the money personally. He heard nothing further about the matter until his arrest in May 1973. Vinson and Warren denied receiving the money from Moore. On November 14, 1972, Vinson was incarcerated at Chino.

During the course of the direct and cross-examination of Moore, he indicated some uncertainty about the identity of the person to whom he gave the money. We set forth his testimony on the subject in the margin.[2]

---

[2]On direct examination he testified:

"Q. When did you next go back to the office of the employer you were representing?

"A. That following morning.

"Q. What, if anything, did you do with the monies that were turned over to you that evening?

"A. Turned it in like I always do.

"Q. To whom did you turn it in?

"A. Whoever was at the office that night.

After the completion of the evidence, argument and instructions the case was given to the jury. The record does not show the precise time that the jury received the case or the precise time it began its deliberations, but

"Q. Do you recall who was in charge of the office when you got there that morning?

"A. Usually at that time of the morning Bert's usually there.

"Q. Who at the office authorized to receive monies that you or the other agents brought in there? Who among the persons were authorized to receive money?

"A. Bert, Vinson, and Miss Raddedorf.

"Q. Those were the three persons authorized to receive monies brought in with these cases?

"A. Yes.

"Q. Can you recall, when you went to the office that morning and turned over the money received from the Eatons—do you have any present recollection as to who was at the office at that time, who specifically you turned the money over to, either one of those three?

"A. I would have to assume that it was Bert. He would be the only one in the office that time of morning.

"Q. After did you turn the money and the papers that had been signed over to him?

"A. Yes.

"Q. Did you thereafter have any other or further connection whatsoever with that case?

"A. No.

On cross-examination he testified:

"Q. I see. You don't recollect who you turned the money in to on the 14th; is that correct?

"A. You mean positive?

"Q. Yes.

"A. No.

"Q. You think it was Bert, right?

"A. I could be reasonably sure, yes.

"The Court: Are you positive it was not the secretary?

"The Witness: No, that's what I'm saying. I can't—

"The Court: You can't be sure whether you gave it to a man or a woman?

"The Witness: I would say it would have to be Bert. When you bring that in that at the time—you know what I mean—every day—you don't stop to remember what specific day who you talked to.

"Q. By Mr. Corrado: Well, Mr. Moore, you indicated yesterday, as I recollect your words correctly, you said Bert was kind of the second in command, I believe is the phrase that you used; is that correct?

"A. Yes.

"Q. Norma was just a secretary; isn't that correct?

"A. Norma was just a secretary?

"Q. That's right.

"A. No.

"Q. What about Sarah?

"A. She worked as an agent.

"Q. Were Norma and Sarah both agents just like you?

"A. Norma was Vinson's old lady.

"Q. I see, that is his—

the colloquy and remarks of the court indicate that the case was given to them sometime after the normal lunch hour and before they had their own lunch on August 2, 1973. Appellant states in his opening brief (p. 22) that the jury began deliberations at 1:50 p.m., and the People's brief does not disagree or suggest any other time. At 4:40 p.m., August 2, 1973, the jury returned to the courtroom at which time the following occurred.[3]

"THE COURT: Mr. Quinn, you have not as yet reached a verdict, have you?

"THE FOREMAN: That is correct, sir.

"THE COURT: Without telling the Court exactly how you stand, that is as to guilt or innocence, how do you stand? Have you taken a vote yet?

"THE FOREMAN: Yes, we have, but it wasn't conclusive.

"THE COURT: You are still considering the evidence?

"THE FOREMAN: We are considering the evidence.

"THE COURT: This Court has problems tomorrow. I will personally not be present. I would like to conclude this case, if it can be done, this evening.

"I certainly see no reason why it shouldn't. If you review the evidence very carefully as to what happened to the money, there is no question but

---

"A. Girlfriend.
"Q. Girlfriend. So if it wasn't Bert it had to be Norma?
"A. Yes.
"Q. Naturally, you wouldn't give it to somebody—give it to Sarah because she was turning in money just like you were?
"A. Yes.
"Q. So it had to be Bert or Norma?
"A. Right.
Under questioning by the court he testified:
"THE COURT: You state that you gave this $1718 in cash either to Bert or Norma; is that correct?
"THE WITNESS: Yes.
"THE COURT: And that was in the morning after you had cashed these checks at the Anaheim bank?
"THE WITNESS: Yes.
"THE COURT: All right, did you get a receipt from either Bert or Norma for that sum of money?
"THE WITNESS: No, I never did get a receipt for no money.
"MR. TOWNSEND: Talk in the microphone so we can all hear you. The jury has to hear, too.
"THE WITNESS: We was never given any receipts for any money that was handed in."

[3]Mr. Townsend, Moore's trial counsel, was not present but was represented by attorney Pete Williams.

what there were victims in this case who were defrauded, they lost their money. There is no dispute on that from anyone. Now it is a question of whether you believe the defendant gave that money to the person that he said he did. Now, listen to the evidence from Mr. Vinson and also—

"JUROR NO. 6: Excuse me, your Honor, would you speak up a little bit?

"THE COURT: You heard Mr. Abraham Vinson come in and testify as to what happened in the course of business, the fact that he was sentenced to State Prison for 90-day observation period. He couldn't have gotten the money. And you heard Bert Warren testify that he didn't receive the money. And you also heard the defendant testify that he was positive he gave it to a man.

"And it seems to the Court that viewing that evidence in the light most favorable to the defendant, you really are led to a conclusion of guilt in this case. The Court's of the opinion that the evidence has established the guilt of the defendant of the charges against him—I am not speaking now with respect to the alleged prior but to the grand theft counts, counts 1 and 2. I believe the evidence has established his guilt beyond a reasonable doubt and to a moral certainty, having heard the evidence and listened to it very carefully.

"Now, I am at liberty as a judge to tell you that; but you are also, as jurors and triers of the fact, perfectly at liberty to completely and 100% disregard the Court's comments and find what you believe the facts to be.

"I would like you to retire back to the jury room and review these facts very, very carefully and search your minds and also the evidence to see if you do not reach the same conclusion. If you do not, by all means you vote exactly according to your interpretation of the evidence.

"Yes, Mr. Castillo?"

Jurors 7 and 10 indicated the jurors had agreed that they wanted to return in the morning. The court then said:

"THE COURT: I want to emphasize again my comments are not binding upon you in any way. If you reach a contrary conclusion, you are perfectly at liberty to do it; you are within your absolute right. And I certainly don't wish to unduly influence you in any way but to point out very definite facts that were presented in this case that would lead the Court to believe that if I were deciding the case myself I would find the defendant guilty, and that would be that.

"But we will continue your matter—the case then until tomorrow morning at 9:00 A.M. All right, then."

Mr. Williams, defendant's substitute counsel, told the court in the jury's presence that he was not familiar with the record but he believed the court's statement was factually inaccurate stating:

"It was my understanding the testimony was somewhat different than the Court outlined to the jury.

"I am not sure Mr. Townsend would have some comments at this point —knowing Mr. Townsend he probably would and, as a result, I would ask that Mr. Townsend—"

To which the court replied:

"THE COURT: I think I have covered that point very well for the jury and I couldn't say more if Mr. Townsend was present, nor could he except to object and I will note your objection in the record to the Court's comments."

The jury was excused at 4:50 p.m., until 9:00 a.m., August 3, 1973. At 10:10 a.m., August 3, 1973, the jury returned with the guilty verdicts already indicated which were taken by a judge other than the trial judge. Moore's original counsel was then present. The jury was excused. Moore's regular trial counsel advised the new judge who had taken the verdict and discharged the jury that he was not certain what the trial judge had said to the jury the preceding day in his absence, but he understood that it constituted "gross misconduct" and he wanted to reserve the right to make a motion for a mistrial and for a new trial. When the motions were ultimately made before the trial judge they were denied.

## DISCUSSION

This case is a classic example of the tremendous calendar pressure that judges and trial counsel function under in Los Angeles County and the problems which can result when counsel make an erroneous estimate of the time required to try a case. This case was estimated to require one day or one day and a half. It actually ran three and one half days at least in part because the court had to handle other business and did not get started on at least one occasion until 11:30 a.m. A reading of the entire record persuades us that the court particularly felt the pressure because of other calendar commitments and the necessity to transfer from the southeast to the central district of the court by a date certain.

The desire of the court to expedite the disposition of the court's business is therefore understandable. However it does not justify or excuse the court in going as far as it did in the case at bar.

The court has a constitutional right to comment on the evidence pro-

vided it does so fairly and accurately. In the case at bar when the court stated to the jury while it was in the course of its deliberations: ". . . you also heard the defendant testify he was positive he gave it [the money] to a man" the court was guilty of an inaccurate summation of the record even though the subsequent colloquy indicated that the court firmly believed that his statement was accurate. Moore was far from positive, he was clearly uncertain whom the money was given to—whether it was Bert Warren or Norma Rottadorf—a man or a woman—but he was inclined to believe that it was probably a man.[4]

■ The comments of a judge on the evidence must be fair, objective and impartial. He must not ignore that evidence which is favorable to the defendant. Here there was a great deal of evidence which was favorable to the defendant which the court's statement to the jury ignored. Vinson claimed that his place of business was "padlocked" while he was at Chino, from October 30, 1972 to January 15, 1973, and that Moore was discharged October 25, 1972. How then was Moore able to receive telephone calls from Mrs. Zimmer and Mr. Eaton and make telephone arrangements on November 13 to meet at the Eaton house at 6 p.m.? Although the precise dates of early telephone conversations with Moore were not fixed, a fair inference is that all calls were after October 25, 1972, and all calls were placed to Moore at the Vinson office. No other telephone number is suggested. The court's statement did not mention these facts. The court's statement that Moore testified "that he was positive he gave it [the money] to a man" was not an accurate statement of the record. It ignored Moore's uncertainty as to who he gave the money to and his uncertainty as to whether he gave it to a man or a woman. Although Moore testified that he might have given the money to Norma Rottadorf, she did not testify and did not therefore deny receiving the money. The court's statement did not mention that fact. ■ The court's failure to mention critical evidence favorable to the defendant in effect withdrew that evidence from the jury's consideration. We conclude that the court's statement on the evidence did not constitute either a fair or an accurate comment on the evidence.

■ Furthermore, and perhaps more important, the constitutional pro-

---

[4]Moore apparently arrived at this conclusion by a process of reasoning. He assumed he turned the money into the office early in the morning, Warren was the only person there early in the morning, therefore, he must have turned it in to Warren. Moore apparently overlooked the fact that he cashed the checks at a bank in Anaheim (which would presumably been after 10 a.m.) and that he traveled from Anaheim to the Vinson office which was located near the coliseum in Los Angeles. Consequently, he could not have turned the money in according to even the People's evidence much before 11 a.m., which hour we do not regard as "early in the morning."

vision giving the judge the power to comment on the evidence (art. VI, § 10) does not include the right to usurp the function of the jury—that is to tell the jury how they should decide the case—even though he may tell the jury that he does not have the power to usurp their function. (*People* v. *Brock,* 66 Cal.2d 645, 650 [58 Cal.Rptr. 321, 426 P.2d 889]; *People* v. *Smith,* 267 Cal.App.2d 155, 162, 165, 166 [72 Cal.Rptr. 696]; *People* v. *Flores,* 17 Cal.App.3d 579, 587, 588 [95 Cal.Rptr. 138].)

In the leading case of *People* v. *Brock,* *supra,* the court told the jury: "It is the opinion of this court, based on the evidence, that the guilt of the defendant . . . has been established beyond a reasonable doubt." The Supreme Court stated that this statement "amounted to a directed verdict". The Supreme Court at page 650 said: "A judge's power to comment on the evidence, however, is not unlimited. (*People* v. *Dail,* 22 Cal. 2d 642, 658 [140 P.2d 828]; *People* v. *Patubo,* 9 Cal.2d 537, 543 [71 P.2d 270, 113 A.L.R. 1303]; *People* v. *Ottey,* *supra,* 5 Cal.2d 714, 724 [56 P.2d 193].) In commenting on the evidence the judge may not withdraw material evidence from the jury's consideration or distort the testimony. (See *People* v. *Scott,* 53 Cal.2d 558, 564 [2 Cal.Rptr. 274, 348 P.2d 882] (overruled on other grounds, *People* v. *Morse,* 60 Cal.2d 631, 649 [36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810]); *People* v. *Friend,* 50 Cal.2d 570, 577 [327 P.2d 97].) Although a judge is not required to comment on all of the evidence, he should be cautious in exercising the comment power with a view to protecting the rights of the defendant (*People* v. *De Moss,* 4 Cal.2d 469, 477 [50 P.2d 1031]), and it is error where in the guise of commenting on the evidence the judge makes statements which contain an erroneous view of the applicable law. (*People* v. *Dail,* *supra,* 22 Cal.2d 642, 656-659.)

"The judge may not in the guise of comment control the verdicts by a direction either directly or impliedly made."

In *People* v. *Flores,* *supra,* after the jury had deliberated three hours, the judge recalled them, made an extensive summation of the evidence in the course of which he said that if they believed the evidence of certain police officers, then they must find the defendant guilty and the court said: "I would not have spent two minutes in deciding this case because I would have decided that the defendant was guilty." In reversing the appellate court said at pages 586, 587, 588: "Acting upon a constitutional and statutory right to comment on the evidence, a trial judge may summarize the evidence critically. (*People* v. *De Arkland,* 262 Cal.App.2d 802, 815 [69 Cal.Rptr. 144]; *People* v. *Shannon,* 260 Cal.App.2d 320, 330 [67 Cal.Rptr. 207].) The summary should be more than a 'colorless

recital.' (*People* v. *De Moss,* 4 Cal.2d 469, 477 [50 P.2d 1031].) However, there is concomitant restraint upon the judge that the comment be fair, and not argumentative. (*People* v. *Huff,* 134 Cal.App.2d 182, 188 [285 P.2d 17], cited in *People* v. *Shannon, supra,* at p. 331.)

"A judge's power to comment on the evidence, however, is not unlimited and he may not withdraw material evidence from the consideration of the jury in so doing.

". . . . . . . . . . . . . . . . . .

"When the trial judge's remarks transgress the bounds of critical comment and assume the complexion of partisan advocacy and conclude with an expression of a defendant's guilt such comment is prejudicial as a matter of law. This is the tenor of the *Brock* decision.

"The court in *Brock,* implicitly recognizing that constitutional and statutory provisions in California confer a right on a trial judge of this state to comment on evidence broader in scope than that which exists in federal courts, says at page 651: 'The federal courts have held that it is improper for a trial judge to state that he believes the defendant guilty, unless the undisputed evidence establishes guilt. (*United States* v. *Murdock, supra,* 290 U.S. 389, 393-394 [78 L.Ed 381, 384-385, 54 S.Ct. 223]; *United States* v. *Woods,* 252 F.2d 334, 336 (and cases cited).) And it has been stated that the power to comment does not give the trial judge the right to determine in his own mind the facts upon which guilt or innocence depends and to make it clear to the jury that he is convinced of the defendant's guilt. (*People* v. *Farnum,* 242 Cal.App.2d 310, 315 [citation].)' If the judge's explanation of the 'evidentiary basis' of his comment on a defendant's guilt develops into a plea for conviction on the grounds that the defendant must have been lying when he testified, such comment on guilt, even though preceded by a dispassionate analysis of the evidence is tantamount to an argument to convict. (See *People* v. *Brock, supra,* 66 Cal.2d 645, 655-656.)"

We conclude that the court's remarks in the case at bar exceeded the constitutional authority conferred on trial judges to comment on the evidence. Bearing in mind the time elements—that the jury had apparently deliberated less than three hours when the remarks were made and the jury returned a guilty verdict within less than two hours after they resumed deliberations, we conclude that the judge usurped the jury's function to such an extent that defendant was effectively deprived of the right to a jury trial. Reversal is therefore mandatory.

We have examined appellant's contention that he was improperly

charged with a conviction of a prior felony and improperly impeached for a prior felony conviction because the conviction of attempted larceny in Allegheny County, Pennsylvania, was only a misdemeanor, and we have concluded as a result of our research that the contentions are probably meritorious and the prior conviction probably was only a misdemeanor. However, we refrain from a definitive ruling in the matter which might become the law of the case because the evidence regarding such conviction produced during this trial was somewhat unclear and confusing. The People did not produce an exemplified copy of a judgment but only a "jacket sheet". Some additional records were procured by defense counsel after the rendition of the verdict but they were not received in evidence and we are uncertain of their evidentiary effect. We refrain from a definitive ruling in order to allow the People to prove a prior felony, if they can do so. We caution the prosecutor, however, that proof of only a misdemeanor on retrial would undoubtedly result in another reversal.

For like reasons we also refrain from ruling on appellant's contention that he should have been prosecuted on only one count of grand theft since he was at most guilty of only one offense notwithstanding the fact that there were two victims.

Since we do not know what the evidence will disclose on retrial, we refrain from establishing the law of the case at this time. ■ However, we caution the prosecutor and trial court, assuming the evidence on retrial to be the same as that at the original trial, that there may well be considerable merit to the conclusion that there was but one continuous indivisible course of conduct having but one objective. If so the law is at least clear that defendant may not be subjected to double punishment. (*People* v. *Bauer,* 1 Cal.3d 368, at pp. 377, 378 [82 Cal.Rptr. 357, 461 P.2d 637, 37 A.L.R.3d 1398]; *People* v. *Beamon,* 8 Cal.3d 625, 636-640 [105 Cal.Rptr. 681, 504 P.2d 905]; *People* v. *Milan,* 9 Cal.3d 185, 196, 197 [107 Cal.Rptr. 68, 507 P.2d 956].)

The appeal from the order denying defendant's motions to set aside the verdict, for a mistrial and a new trial are dismissed. The judgment is reversed.

Kaus, P. J., and Stephens, J., concurred.