[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 322 
A jury found defendant and Ross Thomas guilty of first degree robbery (Pen. Code, § 211); defendant admitted a prior felony conviction (escape from a state prison). Only defendant appeals from the judgment and order denying motion for new trial. The appeal from the order is dismissed.
William Cope was working as an attendant in a Mobil station on Sunset Boulevard on September 1, 1966; around 11:20 p.m. Thomas drove a red car (Plymouth, Chevrolet or Dodge) with a black and white license plate into the station between the office and the pumps; defendant was seated on the passenger side. Cope walked over to defendant and asked if he could help them; defendant stuck a gun out of the window and said, "Give me the cash, you won't get hurt." Cope asked if he might finish waiting on his customer; defendant agreed and followed him around for about 10 minutes. After the customer paid Cope, who put the money in the cash box, defendant told him to leave the box open and open a second cash box; defendant *Page 323 
took all of the money and they drove off at a high rate of speed, their tires squealing. Cope positively identified defendant as the man who sat on the passenger side of the car, followed him around with a gun and took the money.
Andrew Evans, the other attendant, had been out emptying rubbish when the men drove in; upon his return he saw a red late model Pontiac or Chevrolet parked between the pumps and the office. He saw Cope waiting on a customer and a man standing behind him; he stopped on the passenger side of the vehicle, looked in the open window through the car and asked Thomas if he could help him. The area was brightly lighted and he could see Thomas clearly, and positively identified him as the driver. Evans went into the station and after he heard the car leave, Cope ran up the driveway and told him they had just been robbed. Evans checked the cash boxes, then called the police.
Cope described defendant to the officers as having a mustache, wearing light blue tight Levis, high black beatnik-type boots and a light blue tacky shirt, sleeves rolled up and tail hanging out; he could not tell him how tall defendant was or how old. Cope could not tell the police much about the driver, although he said he was about 5 feet 9 to 5 feet 11, weighed 180 to 190 pounds, had light brown hair and a slight squint. Evans could give the police no information concerning defendant, but having looked at Thomas for 10 or more seconds, gave the officers a full description of his face and said Thomas had been wearing a light colored shirt.
Between 11 and 12 p.m. that evening, Mr. Chalme was at home on North Ogden Drive; he heard the loud screeching of brakes and a crash and went outside. Two men, one of whom was Thomas, were running around the corner; they stopped and brushed off their pants. Chalme asked them what had happened and one said, "God, somebody over there is trying to run us over. We're going to get out." Chalme asked if those who had tried to run them down were still there; they said, "No, they just left the car over there and they took off, too." Mr. Monroe, who lived next door, also heard the crash and ran out of his house. In a few seconds he saw two men whom he identified as Thomas and defendant run around the corner where people in the neighborhood were standing outside; they slowed down to a brisk walk and Monroe asked what happened. One of them replied, "Some crazy son of a bitch tried to run us over"; the other said, "Come on, let's get the hell out of here. We're going," then they started on up the block. *Page 324 
Around 11:30 p.m., Mr. Aston, a private patrolman on duty near Sunset Boulevard, saw defendant and Thomas walking down the street together about a block away from the Mobil station; they had walked out of Ogden Drive. Thomas was wearing a T-shirt and defendant was wearing a blue dress shirt with shirt tail hanging out and green denim pants, and had a mustache. They matched the description of two men who had been reported to him as creating a disturbance; he approached and asked them to stand by while he called the police. Defendant and Thomas denied being together or knowing each other. In a few minutes Officer Benel arrived and observed that defendant and Thomas matched the description he had received over the radio of the two persons who had robbed Cope at the Mobil station, arrested them and advised them of their constitutional rights. Defendant and Thomas denied knowing each other, seeing the car before and knowing about the accident or the robbery. When searched each had approximately $70 on his person. He drove them to the scene of the accident where a late model red Chevrolet had collided with a palm tree; the car had a Washington, D.C. license, a white plate with dark numerals. Officer Benel took defendant and Thomas to the Mobil station; Cope then identified defendant and Thomas as the two men who had robbed him.[1] Evans identified Thomas. The officers then drove defendant and Thomas back to the scene of the accident where Officer Benel searched the vehicle. In the glove compartment was a social security card with defendant's name on it; in the trunk was a suitcase with an identification tag bearing defendant's name. When Officer Benel went on duty, in accord with standard practice, he inspected the police vehicle assigned to him by looking under the seat, removing the back seat and checking for contraband; everything was in order. When they delivered defendant and Thomas to the station, the officers checked the vehicle and found a blue steel .32 caliber revolver under the front passenger seat; other than the two officers, only defendant and Thomas had been in the vehicle between the time it had been checked out and when it was returned. Although Officer Benel had searched the two men, he did not check around defendant's waistband under the shirt tail. *Page 325 
Neither defendant nor Thomas testified or called any witnesses for the defense.
[1a] Defendant's sole contention is that the trial judge's comments on the evidence[2] to the jury were of a contentious, *Page 326 
argumentative and prejudicial nature and constituted reversible error.
Formerly, the strict rule in California was that the trial judge could charge the jury only as to matters of law. In 1934 *Page 327 
section 19, article VI, California Constitution, was amended to make the trial judge "a real factor in the administration of justice" in jury cases (People v. Ottey, 5 Cal.2d 714, 722-726 *Page 328 
[56 P.2d 193]); it provided: "The court . . . may make such comment on the evidence and the testimony and credibility of *Page 329 
any witness as in its opinion is necessary for the proper determination of the case. The court shall inform the jury in all cases that the jurors are the exclusive judges of all questions of fact submitted to them and of the credibility of the witnesses." Further amendment effective November 8, 1966, *Page 330 
resulted in a repeal of section 19 and an amendment to section 10, article VI, adding the following: "The court may make such comment on the evidence and the testimony and credibility of any witness as in its opinion is necessary for the proper determination of the cause." Similar provisions are contained in sections 1093, subdivision 9, and 1127, Penal Code.
[2] A judge's power to comment on the evidence is not unlimited. (People v. Brock, 66 Cal.2d 645, 650 [58 Cal.Rptr. 321, 426 P.2d 889]; People v. Scott, 53 Cal.2d 558, 564 [2 Cal.Rptr. 274, 348 P.2d 882]; People v. Friend, 50 Cal.2d 570, 578 [327 P.2d 97]; People v. Dail, 22 Cal.2d 642, 658 [140 P.2d 828]; People v. Patubo, 9 Cal.2d 537, 543 [71 P.2d 270, 113 A.L.R. 1303]; People v. Ottey, 5 Cal.2d 714, 724 [56 P.2d 193].) [3] However, no hard and fast rule determinative of what a trial judge may or may not say to a jury in commenting on the evidence and the credibility of witnesses can be laid down. What particular comment should be or should not be made in a criminal case depends upon the nature of the charge, the nature of the evidence and to some extent on arguments of counsel (People v. Scott, 53 Cal.2d 558, 564 [2 Cal.Rptr. 274,348 P.2d 882]; People v. Patubo, 9 Cal.2d 537, 542 [71 P.2d 270, 113 A.L.R. 1303]; People v. Ottey, 5 Cal.2d 714, 724 [56 P.2d 193]); and whether a trial judge's comment on testimony and the credibility of witnesses has gone beyond judicial discretion is to be determined upon all of the circumstances of the case.
[4] The real purpose of the 1934 amendment was to permit a judge, who by reason of his training in analyzing testimony and experience in determining the credibility of witnesses is in a position to assist jurors in determining what evidence has a bearing on the disputed issues in the case and to aid them in weighing the evidence, and to comment on the evidence and the testimony and the credibility of any witness. (People v.Ottey, 5 Cal.2d 714, 722-726 [56 P.2d 193]; People v.Brock, 66 Cal.2d 645, 650 [58 Cal.Rptr. 321, 426 P.2d 889].)[5] The word "comment" as used in the constitutional provision has been interpreted to empower the trial judge to do more than merely give "a colorless recital, by way of summing up the facts." (People v. De Moss, 4 Cal.2d 469, 477 [50 P.2d 1031].) For the guidance of the jury he may analyze the testimony critically and express his views and opinions with respect to its credibility and may comment on the evidence even to the extent of expressing his opinion as to *Page 331 
the guilt or innocence of the defendant, so long as the province of the jury is not invaded. (People v. Friend, 50 Cal.2d 570, 576, 578 [327 P.2d 97].) [6] The phrase "so long as the province of the jury is not invaded" has always been understood to mean that "He [the judge] may not withdraw material evidence from the jury's consideration or distort the testimony, and his comments should be temperately and fairly made, rather than being argumentative or contentious to a degree amounting to partisan advocacy. The jury, as required by the constitutional provision, must remain as the exclusive arbiter of questions of fact and the credibility of witnesses, and the judge should make clear that his views are not binding but advisory only." (People v.Friend, 50 Cal.2d 570, 577-578 [327 P.2d 97]; People v.Farnum, 242 Cal.App.2d 310, 313 [51 Cal.Rptr. 327].) [7]
Too, comment must avoid the realm of advocacy. (People v.Robinson, 73 Cal.App.2d 233, 238 [166 P.2d 17].) "The rule is well established that such comments on the evidence `must be fair, temperate, judicial, dispassionate, and free from apparent contentiousness, partisanship or advocacy.' (People v.Hooper, 92 Cal.App.2d 524 [207 P.2d 117].) Such comment must be fair and temperate and not argumentative to a degree that makes it characteristically an act of advocacy. (People v.Robinson, 73 Cal.2d 233 [166 P.2d 17]; People v. De Moss,4 Cal.2d 469 [50 P.2d 1031].)" (People v. Huff, 134 Cal.App.2d 182, 188 [285 P.2d 17].)
[8] While it is true that proper comments which "assist the jury are of substantial value and should not be discouraged" (People v. Ottey, 5 Cal.2d 714, 722-726 [56 P.2d 193];People v. Brock, 66 Cal.2d 645, 650 [58 Cal.Rptr. 321,426 P.2d 889]), a judge should be cautious to exercise the constitutional power to comment with wisdom and restraint and with a view to protecting the rights of defendant. (People v.De Moss, 4 Cal.2d 469, 477 [50 P.2d 1031]; People v.Robinson, 73 Cal.App.2d 233, 238-239 [166 P.2d 17].) It is clear from the language of the constitutional provision that the comments authorized are those which in the court's opinion are "necessary for the proper determination of the cause" (§ 10, art. VI, Cal. Const.; People v. Brock, 66 Cal.2d 645, 651 [58 Cal.Rptr. 321, 426 P.2d 889]); and it is equally clear that the major purpose of permitting the judge to comment is to assist the jurors to clarify the issues (People v. Watso, 240 Cal.App.2d 773, 776 [50 Cal.Rptr. 31]; People v. Harris, 87 Cal.App.2d 818. 826-827 [198 P.2d 60]; People *Page 332 
v. Calkins, 8 Cal.App.2d 251, 254 [47 P.2d 544]), determine what evidence has a bearing on the disputed issues in the case and weigh the evidence. (People v. Ottey, 5 Cal.2d 714, 722-726 [56 P.2d 193].)
[1b] Herein the vice of the lengthy comment of the trial judge is its argumentative nature in a case in which comment was not necessary either "for a proper determination of the cause" or to assist the jury. Neither defendant nor Thomas took the stand or called any witnesses for the defense. That which was argued to the jury by defense counsel as a defense consisted of no more than "minor facts" which were gleaned from his cross-examination of the People's witnesses in a wholly unsuccessful attempt to cast doubt on their identification of the defendants and which raised no substantial factual issue. The evidence was undisputed — two eyewitnesses positively identified defendant and Thomas as the robbers, and to corroborate this identification circumstantial evidence was adduced from the testimony of the police officer and three other witnesses who saw defendant and Thomas immediately after the robbery in the vicinity of the Mobil gas station. The overwhelming evidence of guilt gave the jury no reasonable opportunity to acquit defendants. There is but one issue as pointed out by all counsel and the trial judge — the simple, uncomplicated issue of identity and it was on this that the greater part of the testimony was taken.
What assistance then did the jury need in clarifying the only issue in the case or in determining what evidence had a bearing on it or in weighing the undisputed evidence, and in what manner were the judge's comments "necessary for a proper determination of the cause?" The necessity for comment simply did not exist. After all of the evidence was in, the arguments made and the jury fully instructed, and just before the jurors were taken to the jury room for deliberation, the trial judge made a comment on the evidence consisting of 13 pages of reporter's transcript. While at the outset and throughout his comment he disavowed any purpose of invading the fact-finding power of the jury and at the conclusion reread the last instruction previously given, the judge embarked on a lengthy and thorough recapitulation of the People's evidence directed to the sole issue involved interspersed with comments thereon that can be construed as nothing more than strong arguments for conviction approaching the realm of advocacy which exceeds the province of the court in such matters. *Page 333 
[9] However, it is our view that the error, if any, in the court's comment was not prejudicial for the same reason that made the comment unnecessary in the first instance — the overwhelming evidence of guilt. In the light of the record, regardless of the trial judge's comments, we cannot escape the conclusion that the jury could and would not have brought in any other verdict than that defendant and Thomas were guilty of first degree robbery and defendant was personally armed; the evidence admitted no other verdict.
The judgment is affirmed.
Wood, P.J., and Fourt, J., concurred.
[1] Cope later testified: "Both of them in the police car. But I wasn't for sure about the other one [Thomas], but the little guy [defendant] I was sure it was him. The other guy I — that I don't know. I mean I am completely sure it was him. But I know the little guy, Shannon [defendant]."
[2] "THE COURT: It is my practice, ladies and gentlemen, to comment on the evidence of the case in a case, and I intend to comment on it in this case. But before doing so let me say that I notice that it is noon, but I think probably be more efficient to proceed through the instructions and submit the case to you and then let you go to lunch rather than bring you back after lunch for these purposes. So you will indulge me, I think it will be more effective.
"I would like to say something about the effect of my comments. First of them is that that last instruction which I read to you is not only the law of this State and binding on both you and on me, but it expresses my exact intentions and I don't intend anything different than what is said in that instruction. I think jurors are sometimes offended by trial judges commenting on the evidence. I believe that I have observed that. And I think that this is because they feel that the judge is trying to supplant his judgment for theirs. And if I were a trial juror and thought that that's what a judge was doing to me I would be offended also. But that is not my purpose at all. You can't say Judge Hayden is telling us to decide so and so, we will decide that way, nor can you say Judge Hayden is telling us to decide so and so, we will teach him a lesson. Whatever you think about my remarks, that is your duty. I know you intend to perform it. But what I am saying is these remarks, if they are helpful to you, fine. If they are not, that's too bad, and I am sorry to have taken up part of your lunch hour by making them.
"If we were to retire to the jury room together and I were to make these remarks to you, and then you were to respond to my remarks, I am sure that there would be some among you who would be able to point out to me that I had misrecollected evidence, I recollected the evidence differently than it really was. And I am sure there would be those among you who would point out to me I had forgotten important items of evidence, and I am sure there would be those of you who could point out to me that the inferences that I suggested could be brought, drawn from the evidence were not really the best inferences and I had failed to notice other inferences which were more helpful. When we got through discussing the case in that fashion, if we could do it, I think we would be pretty much of a mind as to what the evidence was and pretty much of a mind of what the inferences were to be drawn from the evidence.
"That is not what happens here. I throw these instructions out to you, they may or may not be helpful to you, it is the evidence in the case and the instructions which I have given to you.
"I think I misused the words. I throw these comments out to you, and the evidence in the case and the instructions that I gave you, that I give you and gave you that you use in deciding the case. Whether these comments are helpful or otherwise, you will have to determine that yourselves.
"Another point in passing, I wish to apologize to Miss Bates in the sense of having cut off her question in effect, or cut off getting the answer to her question. It is always difficult to make a judgment about what kind of a ruling should be made in that, in a case of that kind, that is, as to whether or not we should have made an effort to find the answer to those questions. A judge has to make a judgment about what he should do in a case like that, and I did it. If I seemed arbitrary, I am apologetic for it and I hope I was not unduly unwise in doing it.
"To turn to the case now. There seems to be no question that a robbery was committed here, and I would think that you would not have any question as to what the degree of the robbery was with respect to both of the robbers. That is, one of the robbers had a gun and the other robber was in the robbery with him, but I would think there was no doubt that each of those robbers were engaged in a robbery of the first degree. There would be further no question that the person who actually held the gun on Mr. Cope, who has been said to be Mr. Shannon, that that person was personally armed. There is no evidence in the case that I know of to indicate that the driver of the car was personally armed.
"So that if you were to find that these defendants were persons who committed the robbery, then I would think that you would have very little controversy, and I will not dwell on it, simply to say that each of them would then be guilty of robbery in the first degree, and you would return a finding that Mr. Shannon was personally armed and a finding that Mr. Thomas was not personally armed. I would think that to be what the evidence — it was rather clear, assuming you find that they are the persons who committed the robbery.
"The sole question that is presented to you is the question, were these the men that committed the robbery. That's really what you have to decide the case. I wouldn't say all, it is a serious question, but it is a simple issue presented to you.
"In connection with that, you have two different bodies of evidence of a different, each of a different type. You have the testimony of two, the direct testimony, as we say, of two eyewitness persons who testify about this event, and you have the indirect or circumstantial evidence of a number of other persons, oh, well, some inferential matters from the eyewitnesses also, but a number of other persons tending to corroborate that, that eyewitness testimony. And each of those, as I have said in my instructions each class of testimony is equally useful and may be used by you to, for either, for the benefit of the defendants or against them, as you see it relevant.
"The direct evidence was given by Mr. Cope and Mr. Evans. Mr. Cope was the first witness in the case, and he identified Mr. Shannon quite positively here in court and said Mr. Shannon was the man who came up to him and took him to the cash box and then called him back. He told him to get walking and then called him back to open the second cash box, then told him to get walking again.
"Mr. Cope certainly had an ample opportunity to see the robber. He was with him for, must have been several seconds, perhaps as much as a minute. There was a period of time waiting on the car, I suppose the robber was not in his sight during all that time, but there was a fairly extended transaction. And there was a very early confrontation with Mr. Shannon and with Mr. Thomas. The range of time that Mr. Cope estimated was ten to twenty minutes later that Mr. Cope saw the defendants here. The defendants were seated in an automobile, both of them in the back seat with an officer. Three persons in the back seat of the car. The light on the service station lot was said by all witnesses to be good, and the witness who remembered the condition of the dome lights indicated the dome lights in the car were good. Every witness who testified said the lighting conditions for observing the defendants were, when they were in the car, said that the lighting conditions were good, and Mr. Cope said they saw them through a window.
"It is my feeling, my suggestion, I should say, that the question of the physical position in the car, and the question of the physical position of these defendants and the officers is something which, that is, if we knew the answer to Miss Bates' question, that is, what their physical arrangement was and which side of the car Mr. Cope came up to the car from, that we still would not be appreciably assisted in knowing in either giving increased value or decreased value to Mr. Cope's testimony. Because I am sitting here looking at the jurors box, there are any numbers of combinations of three of them sitting alongside of one another. There isn't one of them I could not easily recognize from my position. And yet if we were to move around just a little bit, one of you might easily be blotted out by another one. So that, a very small amount of physical arrangement can make people visible and invisible, and we simply have a statement by a witness that he did see Mr. Shannon in the car, did recognize him. If we knew that Mr. Shannon was near the window or not near the window, I don't think that we would know more about his opportunities to observe. You would still have to say it was quite possible Mr. Shannon had been hid from it. It is also quite possible that he could be clearly in view, whatever his relative position.
"I did not follow too well the testimony in the case relating to the robbery report. You have the robbery report in evidence. I have not myself examined it. It certainly is something that you should consider. I would be, myself, if I were to look at it and evaluate it, I would be slow to place heavy emphasis on it in either direction for, primarily for two reasons. The first of them, that because typically, the descriptions given by witnesses of other people are much less reliable than their capacity to observe and recognize. We all — it is much easier to know a friend on the street than to tell somebody what that friend looks like. And the same thing is true of persons we see very fleetingly.
"The second is that this robbery report is, after all, a report made by a police officer or police officers at the scene taking the statements of one or more witnesses and kind of putting them together as his common impression of what the evidence was that was given to him at that time. So you are taking screen — this is the statements of witnesses screened through the mind of a person we have not really been able to question of what he heard in detail. We questioned him about some things he heard but not in detail, but the robbery [report R.F.C.H.] is there.
"I am not saying it isn't evidence in the case, it is evidence on the case, but I would not, I would say, get hung up on the robbery report. I would suggest that.
"Mr. Cope, in addition to identifying Mr. Shannon quite positively, identified the automobile in part. He said it was a red automobile. He identified an automobile which later talking about in connection with the defendants he identified a red automobile with foreign plates. And I believe it was he that said that they were white and dark. I think he was the witness who said that they had either white lettering and dark background or dark lettering and white — one way or the other. He did not — he acknowledged he might have said that it was a Dodge. The report seemed to indicate that someone said it was probably a Dodge. And the car which circumstances tend to connect with these defendants was not a Dodge, it was another make of car, I think Chevrolet. I think Mr. — I can't remember, Mr. Cope also asserted it was a two-door car. I am not sure about that.
"Mr. Cope was not sure of his identification of Mr. Thomas. As you recall, he had had little occasion to notice Mr. Thomas. His first contact with these people had been after Mr. Shannon got out of the car and his time was with Mr. Shannon.
"Mr. Evans, the next direct eyewitness, identified Mr. Thomas more precisely because he dealt with Mr. Thomas. He had about, I think he said about a ten-second view of Mr. Thomas, and ten seconds seems like a rather short time.
"(Pause.)
"It's the period of time that I have been silent, which is fairly extended period of time. He had a good opportunity to observe as he leaned down and looked in the car, see no particular — not the same degree of reason to have it fixed in his memory that Mr. Cope had, seemed like a much more trivial event to him while he was looking at Mr. — looking at the person in the car.
"He also had an early confrontation and his viewpoint was, I would suggest, is essentially as good as Mr. Cope's. They were not — Mr. Cope got closer to the car, he got within three or four feet of the car, I think testimony was given, and I think testimony of Mr. Evans was about twelve, fifteen feet, I think he said about the distance that he was from one of the counsel, about the distance I am from the jurors here approximately.
"Mr. Evans made the car, as I remember, a red, late model two-door General Motors car. I don't think he testified as to the license plates. Mr. Cope testified as to that. And the car that we were discussing, according to the officers, was a four-door car, and a late model General Motors car.
"Now, the testimony of each of those witnesses is sufficient evidence in the case if you believe them to decide the case, but there are surrounding circumstances which relate to the question of the identification of these defendants.
"The car, as you recall, the robbers' car left the scene of the robbery with squealing brakes, started off with a high rate of speed. There was an accident near by at or about the same time, very close to this time. We are not given the time with absolute precision as to the accident, but it was very close to this time. An accident was engaged in by a car which was very similar to the car that was involved in the robbery. It was a red car, it had foreign plates with white on dark or dark on white, I can't remember which, but it was foreign plates. Again, it was a two-door car, it was a four-door car, but it was very similar to what one of the witnesses had said the car had been, a different make than what another witness said.
"The accident occurred not with another car but with a tree, which would suggest that the high rate of speed in leaving the place might have caused the car to go out of control. And if you recall, one of the witnesses at least said that just before the crash he heard the squealing of brakes, he said, a squealing noise which brought him out. He left, he went to look before he heard the crash. I think that was Mr. Chalme. Then Mr. Chalme came out, having heard the squealing of brakes, and then heard the crash, and he saw two men running on the other side of the street, and he recognizes Mr. Thomas as being one of those two men.
"Mr. Monroe saw two men running, and I — my notes don't show and I don't have a recollection to say whether Mr. Monroe purported to recognize one of the men positively or not. I don't know. I am sure some juror will remember that. If you have a doubt about it, why, you can find out from the reporter.
"And a car which was involved in this collision with the tree around the corner from where these men had, were running, had Mr. Shannon's identification in it. Inside the car itself and also inside the glove compartment. That is, I should say, it wasn't identification, but it had papers which related to him within the car. And one of the two men, and neither witness was able to say which of the two men, made the statement, one of the two men said, `Some crazy son-of-a-bitch tried to run us down. Let's get out of here.' And left the scene.
"Shortly after this time Mr. Aston found these defendants walking once again quite close to the scene of this accident and quite close to the scene of the robbery. He took them into custody. I was not able to decide from his testimony whether he was telling us that he took them into custody for something entirely different than this event or whether it was something that related to it. It wasn't clear to me as to what it was. But anyway, he did take them into custody and at that time they denied knowing one another. Each of them said they didn't know one another.
"And then the, when Mr. Benel came along and took them into custody as formal arrest by law enforcement agency, they once again denied knowing one another, and Mr. Shannon, when he was taken to the accident, denied ever seeing the car before or having any knowledge of the accident.
"When they were taken to the gas station for the identification, the defendants ducked their heads down as if to avoid identification, be an inference that could be drawn about that, in any event, and some time later, that is, at the time when the officers went off watch and search of their car they found the gun which is in evidence on the right front seat of the car.
"It is certainly not entirely satisfactorily explained how that gun got into that car. The officer, I am sure, has some embarrassment about the matter. He was rather frank about pinning himself and his partner down with it. I don't think he avoided his responsibility, but I think he is also not able to help us very well, but it is extremely difficult, I would say, to see where the gun could have come from except from one of these defendants. Taking all the evidence in the case.
"There has been some discussion about the absence of fingerprints here. I, if I were speculating about the case I would have to speculate there are no fingerprints. That's all I can say about that. I am assuming. Perhaps the word speculation is unfortunate. If I were trying to decide what I thought the facts were I would be surprised that one party or another would not have brought in the fingerprints, that fingerprints would have helped one party or another. It seems impossible to believe that some fingerprints would not have been helpful to somebody here, so I have to assume we have no fingerprints.
"And we have the testimony by Mr. Aston that the officers did not search Mr. Shannon in the small of his back and the shirt tail was out.
"Those are the remarks I would make about the evidence, ladies and gentlemen. And I would like to emphasize the effect of those remarks, if I may, by reading to you again a portion of the last instruction which I read to you.
"`I would caution you that it is your right and duty to exercise the same independence of judgment in weighing the Judge's comments on the evidence as you are entitled to exercise in weighing the testimony of the witnesses and the arguments of counsel. You will keep in mind that you are the exclusive judges of the credibility of the witnesses and of all questions of fact submitted to you. Such authority as the trial judge has to express his personal thought on any of these matters is confined to the sole purpose in aiding you in arriving at a verdict, and may not be used and is not used in this case to impose his will upon you or to compel a verdict.'"