[Crim. No. 13961.    Second  Dist., Div. Five.    Nov. 4, 1968.]

THE  PEOPLE,  Plaintiff  and  Respondent.  v.  LAWRENCE
CARLOS  SMITH,  Defendant  and  Appellant.

156

Edward L. Lascher, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Mark L. Christiansen, Deputy Attorney General, for Plaintiff and Respondent.

STEPHENS, J.—Defendant was charged by information in count I with a violation of section 487, subdivision 3 of the Penal Code (grand theft of an automobile), and in count II, with a violation of section 496 of the Penal Code (receiving stolen property). Defendant pleaded not guilty and requested a jury trial. After a trial by jury, defendant was found guilty of violation of section 496 of the Penal Code, and not guilty as to the other count. Probation was denied, and defendant

was committed to the California Youth Authority. Defendant appeals from the judgment rendered against him.

Willie Butler discovered his 1960 2-door black Chevrolet missing some time around midnight on October 16, 1966. He had not given anyone permission to take it, and he reported its absence to the police. He next saw the car on November 5, 1966 at a police impound garage. When he saw the car, he recognized it as his, but he noted that his license plate, RCW 313, was not on the car.

In the early morning hours of November 4, 1966, Officer Ruff of the Los Angeles Police Department stopped a car matching the description given by Mr. Butler. It was being driven by Duane Nolen. Mr. Nolen handed the officer a registration slip and a bill of sale with the names "Lionel Smith" and "Donald Williams" on it. The officer noted that the registration slip had been altered from "1964" to "1966," but otherwise matched the license plate. The officer ran a check on the license plate, which bore a 1966 sticker, and found that it was not current. He checked the identification plate under the hood and found it obliterated. Nolen was informed that unless an identification number could be produced, he would be taken to jail. Nolen kicked open the driver's door, which was jammed, and revealed an identification plate which, on inspection, proved to have merely been glued in place, and matched the registration certificate. Nolen was arrested.

Later that day, at approximately 1:45 p.m., the defendant went to the University Station, where he saw Officer Davis at the front desk. According to the testimony of Officer Davis, defendant told him that he was the owner of a 1960 black Chevrolet, license number JWF 781; that he had loaned the car to Nolen, and that he wanted to pick it up. Officer Davis found that there was such a vehicle, and asked for identification; the defendant gave him a "used draft card" bearing the name of Lionel Smith, and stated he had no ownership papers. He said he was Lionel Smith. Thereupon the officer arrested him and advised him of his rights. After the warning, according to Officer Davis, defendant was shown the vehicle registration and was asked if it was the registration that was in his vehicle; defendant stated it was. Officer Davis then showed defendant the identification plate and asked him if it was the one on his vehicle; defendant stated that it was. The officer asked where he had obtained the car; defendant stated that he had purchased it for $300 on October 8 or October 10

from a Donald Williams. When the officer told defendant that the car had been stolen on October 16, defendant replied that it couldn't have been because he had bought it around October 8; then the defendant stated that the car could have been stolen because he realized that Donald Williams was not the owner of the vehicle; that Donald Williams did not have a pink slip to the vehicle; that Donald Williams could not produce the pink slip. Defendant then admitted that his name was Lawrence Smith, rather than ''Lionel'' Smith. He told the officer that Lionel was his brother and that he used his brother's name because of his (Lawrence's) record. At the time of booking, defendant denied any knowledge as to ownership of the car and claimed he had seen Nolen with the car and thought it possibly was Nolen's car.

Defendant and the People's witness, Nolen, supplied versions of the events which differed radically from those of the police officers and from each other. In the story according to Nolen, he had merely borrowed the car from defendant for the purpose of returning a couple of young ladies to their homes following a dance which he and defendant had attended. Nolen had seen defendant with the car commencing between 3 weeks to a month before the night of the dance, November 4. According to defendant, he, Nolen and some girls spent the evening of November 4 together, with Nolen furnishing and driving the car. They arrived at the apartment of a friend named Max, and from that point defendant stayed at Max's apartment, and Nolen drove the girls home. The defendant stated that at some time prior to this night he did see a bill of sale for the car, and remembered commenting to Nolen that one of the names on it was the same name as that of his brother. Defendant stated that Nolen told him that the car belonged to someone who was serving 200 days in jail. Defendant further testified that on the night of November 4, Nolen, after taking the girls home, was supposed to return to Max's and drive defendant home, but never did. Later in the morning, someone called at a friend's house, relating that Nolen was in jail and wanted defendant to go there with his brother's identification because Nolen had no proof that the car was his. Defendant stated that he had no idea the car was stolen, so he went to the station. Defendant then related that he was booked and advised of his constitutional rights, but asserted that he never told the officer he had given the car to Nolen; never said that he had purchased it from a man named Williams; nor had he said that it was his car. Defendant

stated that his purpose in going to the station was to help his friend Nolen, and that he merely related to Officer Davis the information Nolen had given him concerning the car. He did admit stating that his name was "Lionel" Smith.

Defendant's first contention on this appeal is that the trial court committed prejudicial error in its comments on the evidence and its instruction concerning the effect thereof.[1] Spe-

[1] "THE COURT: It is my practice, ladies and gentlemen, to comment on the evidence in cases, and I intend to comment in this one. Before doing so, I would like to make a couple of remarks about the effects of my comments.

"The first point I would like to make is that that last instruction which I just read to you is not only the law in this State, and therefore binding on you and on me, but expresses my intentions in this case. I do not intend by my comments to supplant your function, or to take over the responsibility of deciding the facts of the case or the credibility of the witnesses.

"I think that I have observed on occasion that jurors are sometimes offended by judges commenting on the evidence, and I have thought that that was because the jurors have felt that the judge did mean to supplant their judgment with his judgment, and did mean to endeavor to perform their functions himself.

"If I were a trial juror and thought that that was what a judge was doing, I would be offended, also.

"I would not blame you, if your evaluation of my comments is such that you think I am endeavoring to take your place, for feeling offended by it. If that is your judgment, I would ask you to do me the favor of simply ignoring my remarks and continuing with your responsibility, which is to decide the case among yourselves from the evidence that you've heard in the case.

"My remarks are no different than the remarks of counsel in the case. They are in no different order of precedence or convincingness. I am simply a person who has been here in the courtroom and has heard the evidence, and I am going to make some remarks about it.

"If the remarks are helpful to you, they will be helpful; if they are not, I am sorry to have used such time as I use.

"In the end, you have no choice except to decide the case yourselves. And you cannot either look to my remarks and say, 'Well, Judge Hayden's trying to get us to decide the case this way. We will decide it that way.'

"Nor, in the alternative, can you say, 'He's trying to get us to decide the case this way; we will teach him a lesson and decide it the other way.'

"Whatever your feelings about my remarks are, you'll have to decide the case. It will be your decision, no matter what my remarks seem to indicate to you.

"If we were jurors together, and I were to retire to the jury room with you, and I were to make these remarks to you, I am sure that there would be those among you who would point out to me that I had overlooked important items of evidence; there would be those of you who would point out to me that I had misrecollected evidence, was not reciting it the way it really had occurred during the course of the trial;

"There would be those among you who would be able to point out to me that the inferences I was suggesting could be drawn from the evidence were not the best inferences, were not the most persuasive inferences, and that there were better inferences that could be drawn; and that perhaps mine were not valid.

cifically, defendant objects to the instruction given by the judge to the jury that it had the ''right and duty to exercise

''When we got through discussing it, I have a fair confidence that we would be pretty much of a mind as to what the evidence in the case was and what the inferences that could be drawn were.

''We don't proceed in that fashion, however, I will make these remarks to you. You will, tomorrow, retire to the jury room, to discuss the case among yourselves. And if my remarks have been of help to you, you will be able to use them. And if they have not, why, you'll address yourselves to your responsibilities.

''Yesterday, I guess—did we start this case yesterday? Yes.

''Yesterday, it seemed to me as if an issue in the case might be the question of whether it was Mr. Butler's car that was recovered. I don't think that—I won't go into the evidence on that subject, but I think that, by the time all of the evidence had come in in the case, that that no longer really was a serious question.

''I think the car had been sufficiently positively identified by Mr. Butler; and there was sufficient connection with the car that was taken from Mr. Nolen that night, that I think that all of us would be satisfied not only that Mr. Butler's car was stolen—and there never was any question but that his car had been stolen—but also that the car that Mr. Nolen had been driving on the night he was stopped by Officer Ruff was Mr. Butler's car.

''So that we know, almost certainly, that the first count charged, the count of grand theft auto, was committed by some person. There seems to be little doubt about that.

''As to that count, the question that you have to decide is whether this defendant was the person who committed that offense. And I—in that connection, I note that the placing of altered plates on the car, and the removal of the frame number, and its substitution by another frame number, where it's put under the hood of the car, all of them tend to support the proposition that the car was not just taken for the time being, but was taken, essentially, to permanently keep it. I don't think' there's really any serious question about that.

''As we know, when the car was taken by the police, not only did it have the exhibits which are here—that is, the registration which had been altered from a 1964 registration, a registration which matched the plates, and which matched also the glued-on body number—but it had in it a bill of sale; and that bill of sale was made out to a Lionel Smith.

''And at the time that Mr. Nolen was identifying himself to Officer Ruff—that is, was endeavoring to satisfy Officer Ruff as to the ownership of the car, and so forth,—one of the items that he showed him was a bill of sale to a Lionel Smith.

''We are not told by any witness, as I recall, how the news that Mr. Nolen had been arrested was transmitted to this defendant. And by that, I am not saying—this defendant has told how he learned of it. But we are not told how whoever it was that he says called him, to tell him that Lionel Smith was in custody, learned of it. That's not clear—or, pardon me; that Mr. Nolen was in custody, is not clear.

''But eventually, the testimony in the case is that this defendant did call the Police Department, and I believe the witnesses are agreed that he did talk to Officer Davis, did indicate he was the owner of the car, and did come to the police station and identify himself as Lionel Smith.

''At that time he was taken into custody. The question—the disparity in the accounts is whether or not this defendant ever had anything to do with that car.

''The argument presented by the defense is that it really is not—if you believe Mr. Nolen, and if you believe Officer Davis, then you can't believe the defendant as to the circumstances; that is, his story is cate-

the same independence of judgment in weighing the judge's comment on the evidence as you are entitled to exercise in weighing the testimony of the witnesses. . . .'' Four recent

gorically different than Mr. Nolen's story is, and is substantially different than Officer Davis' story as to the circumstances of his coming into the station.

''The point is made by Mr. Latimer—and I think quite correctly made —that this defendant is not on trial—that if you should disbelieve him, that this does not make him guilty of this offense; that he is not on trial for having told you a falsehood on the stand, if that is what you should conclude that he has done; nor is he on trial for anything except these two specific charges.

''Mr. Latimer urges—and I think quite correctly—that it is the burden of the People to establish beyond a reasonable doubt that this defendant was the person who stole the car; or, if he was not the person who stole the car, then beyond a reasonable doubt, that he received the car and kept it at a time when he had good reason to believe it was stolen.

''Now——

''Mr. Latimer: Your Honor, may counsel and I approach the bench? The Court: Yes.

''(The following proceedings were had at the bench, outside the hearing of the jury):

''Mr. Latimer: I believe 'good reason to believe' is not enough. There must be knowledge.

''The Court: That he knew——

''Mr. Latimer: Yes, that he knew.

''The Court: ——at the time? Yes, I think you are right. That's correct.

''Mr. Latimer: I would ask the court to make that correction.

''The Court: Yes, I will.

''(The following proceedings were had in open court, within the presence and hearing of the jury):

''The Court: Mr. Latimer has quite correctly pointed out—I'm not giving instructions now, but in my comments I have misstated a rule of law.

''I think my instructions correctly stated the rule of law. He must have received the car knowing that it was stolen.

''There were instructions given to you as to how you might reach the conclusion that he knew it was stolen; namely, if he received it at a time when he had good reason to know that it was stolen, then you might infer from that that he knew; but unless you do conclude beyond a reasonable doubt that he knew, then he is not guilty of that offense, either.

''And he points out that the argument can be made that the defendant—that, in going to the station and identifying himself as Lionel Smith, the defendant was taking a grave chance on being found to—if he knew that the car was stolen, the defendant was taking a chance on being caught, being picked up on this charge.

''There was testimony given to you by a Robert Nobles, called on behalf of the defendant, in an effort to establish that the defendant had not operated the car, and that Duane Nolen had operated the car.

''I don't think that anything occurred in the examination or cross examination of Robert Nobles to cast any particular doubt on the truth of his testimony.

''I am now not clear, but my recollection is that his testimony was corroborated, in part, by Mr. Nolen; I'm not sure. I think so.

''I point out to you that Mr. Nobles' testimony really tells you very little more than what Mr. Nolen has told us, or the defendant tells us, in that he says he saw the defendant somewhere around Halloween

cases have dealt with substantially the same language as that quoted above. (*People* v. *Brock*, 66 Cal.2d 645, 649 [58 Cal.

someplace on the street; and that thereafter, sometime around the date that—apparently the date that all the testimony is relating to, the day before Nolen was arrested, that he visited the defendant's grandmother's house, and that Mr. Nolen came to the house, and was—came to the house in the car, and was there for a few moments, and went away.

"That is essentially his testimony. And he says he has never seen this defendant with the car.

"But on further examination, apparently he has not really seen this defendant very much, in any event, during the period of time that the car had been taken.

"That is essentially his testimony. And he says he has not really seen this defendant very much, in any event, during the period of time that the car had been taken.

"The testimony which tends to link the defendant with the offense or offenses that are charged here is, one, the question of the credibility of his story entirely; and the fact that he told a story which was not truthful in connection with his connection with the car; that is, he identified himself as being someone he was not, a person who—there were papers to indicate—owned the car, and who was not him; that is, his brother.

"The defendant has told us that he—and told us with some precision, at one point in his examination, that he knows about police investigative practices relating to detection of car thefts; namely, that it is routine practice to check plates against registration and registration against body numbers; and that he is familiar with this—and I think he told us this in the sense of saying that his relatives were members of police agencies, and that he knew that this would happen, and he would not be foolish enough to be involved in a transaction of this kind.

"I notice that, in this case, those three combinations of circumstances were met by the—whoever had stolen the car, whoever kept the car; that is, the plates did check with the registration and did check with the body number.

"The other objective fact, which is noted in counsel's argument with respect to the question of his guilty knowledge, and from which an inference might be drawn, was the fact that he stated that he had had the car since a time before the time when the car was stolen.

"He gave the time of October 8th; and then October 10th. And the evidence in the case indicates that it was stolen apparently on October 16th or 17th, some period of time after the time he says he had the car.

"As I say, the defendant is not on trial for his credibility, and he is not on trial for the impression he may have made upon you on the witness stand. He is on trial on specific charges, and it is your responsibility to decide whether or not he is guilty of those offenses beyond a reasonable doubt—either of them, one or the other of those—beyond a reasonable doubt.

"That concludes my remarks. I will finish by once again repeating a portion of the instruction which I gave you a little earlier.

"I would caution you that it is your right and duty to exercise the same independence of judgment in weighing the judge's comments on the evidence as you are entitled to exercise in weighing the testimony of witnesses and the arguments of counsel.

"You will keep in mind that you are the exclusive judges of the credibility of the witnesses, of all questions of fact submitted to you. Such authority as the trial judge has to express his personal thought on any of these matters is confined to the sole purpose of aiding you in arriving at a verdict, and may not be used and is not used in this case to impose his will upon you or to compel a verdict.

"We will take our afternoon recess at this time, and I will ask you

Rptr. 321, 426 P.2d 889]; *People* v. *Shannon,* 260 Cal.App.2d 320, 329 [67 Cal.Rptr. 207]; *People* v. *George,* 259 Cal. App.2d 424, 430 [66 Cal.Rptr. 442]; *People* v. *Thompson,* 252 Cal.App.2d 76, 91 [60 Cal.Rptr. 203].) The first of these, *People* v. *Brock, supra,* held such comment to be improper because it suggests that the jury can decide the case on the basis of the judge's comment without regard to the evidence in the case. The trial court in *Brock* also commented to the jury that " ' [*i*]*t is the opinion of this Court . . . that the guilt of the defendant . . . has been established beyond a reasonable doubt.' "  (66 Cal.2d at p. 649.) The evidentiary basis for such comment was not explained to the jury.

It is clear from the language of our state Constitution that the comments authorized are those which in the court's opinion are "necessary for the proper determination of the cause." (Cal. Const., art. VI, § 10.) Comment which will assist the jury is of substantial value and should not be discouraged. *People* v. *Ottey,* 5 Cal.2d 714 [56 P.2d 193].) But the vice of a general comment on guilt "without discussion of the evidence is that it does not aid the jury in applying the instructions on the law to the evidence in the case but to the contrary provides for the jury a means to avoid the preliminary determinations called for by the instructions on the law and instead to rely on the words of the judge in returning a conviction." (*People* v. *Brock, supra,* at p. 651.)   Stated affirmatively, it is permissible for a judge to express his opinion as to the guilt or innocence of the defendant (*People* v. *Friend,* 50 Cal.2d 570, 578 [327 P.2d 97]), but only where the evidentiary basis for the comment is explained to the jury. (*People* v. *Brock, supra,* at pp. 654-655.) The general comment on the issue of guilt without an explanation as to the evidentiary basis for such comment, coupled with the erroneous instruction previously quoted as to the evidentiary weight which the trial judge's comments were to be accorded, required a reversal of the judgment in *Brock.* In the present

to return tomorrow morning at 9:00 o'clock, if you will. I'll give you the concluding instructions, and then you will have the opportunity to deliberate on the case.

"I want to emphasize again, ladies and gentlemen, this point. You've heard all of the evidence in the case; you've heard the arguments of counsel; you've heard my comments; you've heard most of the instructions—although not all of them—but you have not yet had an opportunity to discuss the case among yourselves.

"And it is more important than ever that, at this time, you abide by the admonition which I heretofore gave you with respect to discussing the case."

case, the trial court did not make any general comment on the issue of guilt, and such comments that were made were integrally intertwined with the evidence. Whether the court in *Brock* would have reversed absent the general comment on guilt and solely because of the erroneous instruction on the evidentiary weight to be accorded the judge's comment is questionable. Even where both of these errors are present, no prejudice will be found where there is overwhelming evidence of guilt. (*People* v. *George, supra,* at p. 431; *People* v. *Thompson, supra,* at p. 93.) The only case we were able to find which contained the objectionable instruction absent a general comment on the issue of guilt was *People* v. *Shannon, supra,* (at pp. 325-329), in which the defendant failed to raise the issue. Instead, he attacked the trial court's comment in its entirety on the basis that it was contentious, argumentative and prejudicial. The court agreed but nevertheless affirmed defendant's conviction, again on the basis that there was overwhelming evidence of guilt.

What is the rule governing the situation where the trial judge erroneously instructs the jury on the evidentiary effect of his comments, but does not make a general conclusionary comment on the guilt or innocence of the defendant? The following comment in *People* v. *Brock, supra* (at p. 652) sheds some light on the gravity of the error: "Apparently, the judge intended to advise the jury that it could reject his views, but the language used unfortunately also conveys the idea that his comment is on a par with the testimony and subject to the same independence of judgment in determining the case. The danger that the jury may have viewed the comment in the latter sense may not be minimized. The jury is ordinarily aware that the judge has participated in numerous trials and dealt with the attorneys in the past and that numerous matters regarding the case have taken place in the presence of the judge but outside the presence of the jury. In these circumstances there is a great danger that a jury which may wish to escape its responsibility to determine the facts will give weight to the comment of the judge without considering the evidence and the instructions."

In the present case, however, we need not embark upon an elaborate search of the record to ascertain whether or not the evidence of guilt is overwhelming. It is readily apparent that in commenting upon the evidence, the trial court clearly invaded the province of the jury as the exclusive trier of fact. The only defense offered by defendant was that he

was not the person who committed the offense. Since defendant's version of the facts was materially different from the version offered by the witness Nolen, and radically different from that of the police officer, the success of his defense depended entirely on the jury's acceptance of his version. Nevertheless, at one point in his comment to the jury, the trial judge stated: "The testimony which tends to link the defendant with the offense or offenses that are charged here is, one, the question of the credibility of his story entirely; and *the fact that he told a story which was not truthful* in connection with his connection with the car. . . ." (Italics added.[2]) Such comment effectively destroyed the only defense which defendant offered in exculpation of the crimes charged. The vice of such comment was that the judge effectively took the issue of defendant's credibility away from the jury. While it is certainly within the province of the trial court in a proper case, for the guidance of the jury, to analyze the testimony critically and to express his views and opinions with respect to its credibility (*People* v. *Friend, supra,* 50 Cal.2d 570, 576), he may not, as in the present case, state as a matter of independent evidence that it is a *fact* that the story offered by defendant was false. Such an error when bearing on a vital issue in the case is not cured by prior or subsequent unexceptional and unilluminating abstract charges that the defendant is not on trial for his credibility. (See *Bollenbach* v. *United States,* 326 U.S. 607 [66 S.Ct. 402, 90 L.Ed. 350].)

An even more egregious error of this nature was committed when the trial judge stated that "the testimony in the case is that this defendant did call the Police Department, and I believe the *witnesses are agreed* that he did talk to Officer Davis, *did indicate he was the owner of the car,* and did come to the police station and identify himself as Lionel Smith." (Italics added.) The record clearly reflects that the defendant categorically denied that he ever told Officer Davis that the car was his, and only *one* witness (Officer Davis) testified that such a statement was made by defendant. When this comment is considered in conjunction with the later comment that the defendant's story was not truthful, and that such comment of the judge may be weighed "as evidence," the task of the

---

[2]It seems probable that the intended reference to defendant's untruthful story was to his statements to Officer Davis, rather than to his testimony on the stand. Unfortunately, to a lay person this was not at all clear. Further, there was a conflict between defendant and Officer Davis as to just what was said by defendant, the latter only admitting that he had pretended to be his brother.

jury with respect to the defense offered by defendant was at an end. The jury was effectively precluded from considering material evidence and relevant testimony. ▮ As stated by the court in *People* v. *Shannon, supra,* 260 Cal.App.2d 320, 331: ''The phrase 'so long as the province of the jury is not invaded' has always been understood to mean that '[H]e (the judge) may not withdraw material evidence from the jury's consideration or distort the testimony, and his comments should be temperately and fairly made, rather than being argumentative or contentious to a degree amounting to partisan advocacy. The jury, as required by the constitutional provision, must remain as the exclusive arbiter of questions of fact and the credibility of witnesses, and the judge should make clear that his views are not binding, but advisory only.' (*People* v. *Friend,* 50 Cal.2d 570, 577-578 [327 P.2d 97]; *People* v. *Farnum,* 242 Cal.App.2d 310, 313 [51 Cal.Rptr. 327].)'' The comments are highly prejudicial for they transcend the expression of judicial comment when weighed in the light of the erroneous instruction previously alluded to that would permit the jury to weigh the judge's comments on the evidence in the same manner and to the same extent as the testimony of the witnesses.

▮ While at the outset and throughout his comment the trial judge disavowed any purpose of invading the fact-finding power of the jury—and that may well have been his intent—we conclude that the comment taken as a whole can be construed as nothing more than a strong argument for conviction, and nothing less that a total disparagement of defendant's only defense. Such comment approached the realm of advocacy, exceeded the proper province of the trial court, and materially prejudiced defendant's trial.

Of the remaining contentions of defendant on this appeal, only one merits examination since the additional errors complained of are unlikely to occur at retrial.

▮ Defendant contends that it was an erroneous statement of the nature of the crime to instruct the jury in substantially the same language as section 496, subdivision 1 of the Penal Code because this indicated that defendant could be convicted of either receiving or concealing stolen property. Count II of the information charges defendant with violation of section 496 of the Penal Code in that he received and concealed the property. Section 496, subdivision 1 lists the same elements as those outlined in the instruction. The case relied upon by defendant, *People* v. *Feldman,* 171 Cal.App.2d

15 [339 P.2d 888], is not on point since in that case the indictment failed to charge defendant with concealing the property. The instruction in the present case was neither misleading nor a misstatement of the law.

The judgment is reversed.

Kaus, P. J., and Drucker, J. pro tem.,* concurred.

Respondent's petition for a hearing by the Supreme Court was denied December 30, 1968.

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.